STATE OF NORTH CAROLINA v. DANNY FURMAN RICHARDSON

No. 345A90

(Filed 3 April 1991)

1. Criminal Law § 35 (NCI3d) — rape, robbery, and murder — evidence of prior assault — offered to show guilt of another — not admissible

The trial court did not err in a prosecution for robbery, rape and murder by excluding evidence that someone other than the victim had been attacked two months earlier in the hospital basement, where this attack occurred, by a black male attired similarly to the suspect in this case. The crimes were not similar because the earlier victim was not raped, there was no evidence that her attacker was attempting to rape her, the attacker's identity was not known, and there was no evidence that the man who grabbed the earlier victim also committed the offense against the victim here. N.C.G.S. § 8C-1, Rule 401.

Am Jur 2d, Evidence § 441.

2. Criminal Law § 66.11 (NCI3d) — out-of-court identification — procedure suggestive — no prejudice

The trial court did not err in a prosecution for robbery, rape and murder by admitting out-of-court identifications by witnesses where the identification procedures the officers chose, coupled with their statements to two of the three witnesses that they had a suspect, were unduly suggestive, but the corrupting effect of the suggestive identification procedure was insufficient to tip the scales against defendant. None of the witnesses conferred with one another prior to viewing defendant, the witnesses had substantial opportunities to view defendant, the descriptions were substantially similar and were accurate, the witnesses indicated a higher than average degree of attention, the identifications were certain, and the identifications followed within three hours of the initial sightings.

Am Jur 2d, Evidence §§ 371, 371.4, 371.5, 372.

Admissibility of evidence of showup identification as affected by allegedly suggestive showup procedures. 39 ALR3d 791.

STATE v. RICHARDSON

[328 N.C. 505 (1991)]

**3. Homicide § 18.1 (NCI3d)— premeditation and deliberation— inference from strangulation—no error**

The trial court did not err by allowing the prosecutor to argue that the jury could infer premeditation and deliberation from the strangulation of the victim. The jury may infer premeditation and deliberation from the circumstances of a killing, including strangulation.

**Am Jur 2d, Homicide §§ 276, 439; Trial § 260.**

**4. Criminal Law § 685 (NCI4th)— request for special instructions not in writing—not timely**

The trial court did not err in a rape prosecution by refusing to give defendant's requested instruction on serious personal injury where defendant made his request orally after the jury retired. Requests for special instructions should be submitted in writing at or before the jury instruction conference.

**Am Jur 2d, Trial §§ 580, 582, 583.**

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment upon a jury verdict finding him guilty of first-degree murder entered by *Helms, J.,* at the 30 October 1989 session of Superior Court, UNION County. On 7 August 1990 this Court allowed defendant's motion to bypass the Court of Appeals as to judgments of life imprisonment entered upon his conviction of first-degree rape and ten years imprisonment entered upon his conviction of common law robbery. Heard in the Supreme Court 11 February 1991.

*Lacy H. Thornburg, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant appellant.*

WHICHARD, Justice.

Defendant was indicted for the common law robbery, rape, and murder of Gladys Byrum. He pled not guilty and was tried (capitally on the murder charge) at the 30 October 1989 session of Superior Court, Union County. The jury returned verdicts of guilty of common law robbery, first-degree rape, and first-degree murder, finding both that the murder occurred during the commis-

sion of the felonies of rape and common law robbery and that it was committed with malice, premeditation and deliberation. The jury found aggravating circumstances and no mitigating circumstances, but nevertheless recommended life imprisonment for the murder conviction. The trial court sentenced defendant to two consecutive terms of life imprisonment for the first-degree murder and first-degree rape convictions and to a further consecutive ten-year term of imprisonment for the common law robbery conviction. We find no error.

Shortly after 6:15 a.m. on 3 May 1989, Paulette Maske, an employee of Union Memorial Hospital, went to see Gladys Byrum, the victim, at Byrum's work station, the sewing room in the hospital basement. The only door to the sewing room opens from the basement corridor near the elevators, and Maske found it propped open with a screwdriver rather than the usual doorstop. When she did not find the victim there but noticed that a sewing machine was running unattended, Maske turned off the machine and asked four times, "Are you doing all right this morning?" A voice that Maske testified was not the victim's responded "uh-huh" through the closed bathroom door at the end of the sewing room. Maske could see that the bathroom lights were not on and that the victim's purse was on top of the desk, which was unusual. Maske went to her office and commented to two co-workers that the voice she heard did not sound like the victim's. Approximately six minutes later, she and James Meadows left the nearby storeroom and walked toward the sewing room. They saw a black man with short hair and a "rattail"—wearing a blue jean jacket, black pants, dark rubber gloves, and dark tennis shoes—pushing a cart rapidly. Looking in the room, Maske saw the victim's leg, whereupon she alerted others. She saw an aerosol can, on which defendant's prints later were found, but did not see the victim's purse.

Hospital employee James Stokes testified that as he went to clock in at about 5:55 a.m., he passed defendant in the basement hallway. Other witnesses testified that the hall is well-lit by overhead fluorescent lights. A few minutes later Stokes saw defendant again for a period of about two or three minutes from a distance of about two feet. He noticed that defendant was holding black, elbow-length rubber gloves in his hand. Stokes also testified that the hallway was well-lit, and his description of defendant's clothing and hairstyle matched that of Maske.

Employee David Baskins testified that as he parked his truck coming to work that morning at 6:25 a.m., he noticed defendant running from the corner of the hospital building. When defendant looked in Baskins' direction, he quit running. Baskins testified that the natural lighting was adequate to enable him to see defendant. Baskins observed defendant from distances ranging from sixty-five yards to twenty yards. Baskins testified that defendant walked past before turning to look at him. His description of defendant's clothing comported with that of Stokes and Maske, and he testified that defendant was carrying a bag.

Officer Debbie Tetlow testified that she saw bloodstains on the bathroom wall, a silver and green aerosol can on which defendant's prints were found, a bracelet, and a woman's tennis shoe.

Officer Jerry Whitaker testified that he was patrolling the area around the hospital and observed Officer Deese talking to defendant, who wore a rattail. About fifteen minutes later, with defendant's permission, Whitaker took defendant to the hospital. At this time defendant was carrying a bag containing a jean jacket and black pants. The following day Whitaker found the victim's ring on the passenger side of his patrol car.

Officer Mitch Deese testified that at about 6:30 a.m. he received a call to assist investigating officers. He spotted defendant sporting a rattail and wearing jam shorts, a tee shirt, and tennis shoes, and he detained him briefly. Upon receiving information that the suspect had a rattail, Deese radioed that defendant might be the man sought. After Officer Whitaker took defendant to the hospital, Deese, with defendant's permission, looked in defendant's bag. The bag contained a jean jacket and black pants.

Nurse Sylvia O'Brian testified that she saw defendant in the emergency room at about 3:30 a.m. the day of the murder; she said he was waiting with the Polk family in connection with a drug overdose case.

The State's physical evidence was as follows: The samples recovered through rape kit procedures neither eliminated nor implicated defendant conclusively. Combings of the white victim's pubic hair yielded two Negroid hairs. The cause of death was strangulation by hand.

Defendant's evidence showed that he cut his hand at work on 2 May. He testified that he worked until 6:30 or 7:00 p.m.

that day, then visited friends before packing a bag at 3:15 a.m. to go to his girlfriend's house. After finding someone else there, defendant was en route to his aunt's house to spend the night when police stopped him near the hospital. Officer Jackson and several members of the Polk family (the family that Nurse O'Brian testified was waiting in the emergency room) testified that defendant was not waiting in the emergency room in the early morning.

[1] Defendant sought unsuccessfully to introduce evidence that on 3 March 1989 Sondra Melton was attacked in the hospital basement by a black male attired similarly to the suspect the hospital employees described here. Defendant argues that the trial court erred in excluding this evidence. He contends that under *State v. Cotton*, 318 N.C. 663, 351 S.E.2d 277 (1987), the evidence should have been admitted to show that someone else committed the crime.

In *Cotton* the Court concluded that Rule 404(b) applies both to the State and to the defendant, and that a defendant can "introduce evidence of very similar crimes of another, when such evidence tends to show that the other person committed the crime for which the defendant is on trial." *Cotton*, 318 N.C. at 666, 351 S.E.2d at 279. To be admissible, however, "such evidence must point directly to the guilt of another specific party and must tend both to implicate that other party and be inconsistent with the guilt of the defendant." *State v. Brewer*, 325 N.C. 550, 561, 386 S.E.2d 569, 575 (1989), *cert. denied*, --- U.S. ---, 109 L. Ed. 2d 541 (1990) (citing *Cotton*, 318 N.C. at 667, 351 S.E.2d at 279-80). To be admissible under Rule 401, the evidence must do more than simply raise conjecture or speculation. *Id.* at 561-62, 386 S.E.2d at 576. Rather, "[i]t must point directly to the guilt of the other party." *Cotton*, 318 N.C. at 667, 351 S.E.2d at 279.

The defendant in *Brewer* sought to introduce evidence that the passenger in a white, "Honda-type" automobile, rather than the defendant, fired shots into homes. At most this evidence established that a white Honda was in the vicinity at the time of the shootings. *Brewer*, 325 N.C. at 562, 386 S.E.2d at 576. The evidence was not admissible because "it fail[ed] to point to a specific other person as the perpetrator of the crime with which defendant [was] charged." *Id.* at 562, 386 S.E.2d at 575. In *Cotton*, by contrast, the identity of another was specific and all three crimes were identical; the attacker entered rear doors to homes and shouted

"Hey baby, how are you doing?" before assaulting the victims. *Cotton*, 318 N.C. at 665, 351 S.E.2d at 279.

Here, the crimes were not similar; Melton was not raped and there was no indication that her attacker was attempting to rape her. Further, the attacker's identity was not known. Last, there was no evidence to indicate that the man who grabbed Melton also committed the offense against the victim here two months later. On these facts, *Cotton* does not control and this assignment of error is overruled.

[2] Defendant next contends that identification testimony should have been excluded because the pre-trial identification procedures were unduly suggestive and created a substantial likelihood of misidentification.

> Both the United States Supreme Court and this Court have criticized the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup . . . ." . . . This Court has recognized that such a procedure, sometimes referred to as a "showup," may be "inherently suggestive" because the witness "would likely assume that the police had brought [him] to view persons whom they suspected might be the guilty parties."

*State v. Oliver*, 302 N.C. 28, 44-45, 274 S.E.2d 183, 194 (1981) (citations omitted).

In determining the admissibility of pre-trial identifications, the court first must determine whether the identification procedures were "unnecessarily suggestive." *Id.* at 45, 274 S.E.2d at 194. If the identification procedures were unnecessarily suggestive, the court then considers whether they "have created a likelihood of irreparable misidentification." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 198, 34 L. Ed. 2d 401, 410 (1972)). This depends upon whether "under the totality of circumstances surrounding the crime itself 'the identification possesses sufficient aspects of reliability.'" *Id.* at 45, 274 S.E.2d at 195 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 106, 53 L. Ed. 2d 140, 149 (1977)). The totality of the circumstances test is a balancing test and includes the following factors:

1) The opportunity of the witness to view the criminal at the time of the crime;

2) the witness' degree of attention;

3) the accuracy of the witness' prior description;          ·

4) the level of certainty demonstrated at the confrontation; and

5) the time between the crime and the confrontation.

. . . . Against these factors must be weighed the corrupting effect of the suggestive procedure itself.

*State v. Pigott*, 320 N.C. 96, 99-100, 357 S.E.2d 631, 634 (1987) (citing *Manson v. Brathwaite*, 432 U.S. at 114, 53 L. Ed. 2d at 154).

Here, approximately two to two-and-a-half hours after the attack employees Stokes, Maske, and Baskins identified defendant as the man they had seen earlier. During these identifications defendant was sitting alone or with uniformed personnel in the security office at the hospital. Before Stokes and Maske viewed defendant, investigating officers told the witnesses defendant was a suspect. Baskins went to the security room on his own initiative after being told "they had somebody up there." Baskins looked at defendant for about five minutes before identifying him as the man he had seen outside the hospital gate.

The identification procedures the officers chose, coupled with their statements to two of the three witnesses that "they had a suspect," were unduly suggestive. *See State v. Oliver*, 302 N.C. at 45, 274 S.E.2d at 194 (identification procedure unduly suggestive where officers told witness he "could see that man again" and let him view the defendant as the defendant stood alone in a room). Nevertheless, under the totality of the circumstances each witness's identification was sufficiently reliable to be admissible.

Maske saw defendant in the corridor outside the sewing room for about three to four seconds after her suspicions were aroused by the empty sewing room and the unfamiliar voice coming from the bathroom. Her description matched that of other witnesses, and she was unequivocal in her identification. The showup identification occurred about forty-five minutes after she observed defendant.

Stokes observed defendant for two or three minutes from a distance of two feet in the well-lit basement hallway; he and defendant spoke briefly. He saw defendant two hours later in the security room. Stokes then described what defendant looked like and what defendant had been wearing when he saw him earlier in the hallway. His description was consistent with Maske's, even though defend-

STATE v. RICHARDSON

[328 N.C. 505 (1991)]

ant was clothed differently by this time. Stokes was certain in his identification.

Baskins observed defendant from distances ranging from sixty-five to twenty yards over the course of ten to fifteen minutes. Because (1) Baskins did not usually see people in that area of the hospital at that early hour, (2) defendant stopped running when he saw that Baskins was watching him, and (3) Baskins noticed that defendant was looking at him, Baskins paid attention to defendant. Baskins' description included clothing, the bag defendant carried, and his approximate height and weight. Before identifying defendant, Baskins looked at him for about five minutes "to be sure." Approximately two-and-a-half hours passed between the initial encounter and the identification in the security room.

Considering the totality of these circumstances, we conclude that the corrupting effect of the suggestive identification procedure was insufficient to tip the scales against defendant. None of the witnesses conferred with one another prior to viewing defendant. The witnesses had substantial opportunities to view defendant; the descriptions were substantially similar and were accurate; the witnesses indicated a higher than average degree of attention; identifications were certain; and the identifications followed within three hours of the initial sightings. Thus, the trial court did not err in admitting the out-of-court identifications.

[3] Defendant also contends the trial court erred in allowing portions of the prosecutor's argument. The relevant portions are:

[PROSECUTOR]: . . . [T]he premeditation and deliberation . . . can come over any period of time, no matter how short. And, members of the jury, deliberation can also be inferred from the acts, from the use of excessive force, from brutal circumstances, and from the manner and means.

Strangulation does not occur the State would contend to you by accident. You don't accident[al]ly strangle somebody. You might be able to accident[al]ly shoot somebody or accident[al]ly run them over with a car.

[DEFENSE COUNSEL]: Objection to accident not —

THE COURT: Overruled. Go ahead.

[PROSECUTOR]: But manual strangulation takes an effort, takes a deliberate act, takes a premeditated act. It takes an act of thinking it out and doing it.

STATE v. RICHARDSON

[328 N.C. 505 (1991)]

Members of the jury, the State contends to you from the circumstances in this case you can find that premeditation and find that deliberation from the acts, and it's obvious from the acts here that this defendant was the aggressor.

Defendant argues that the prosecutor's statements impermissibly eliminated the State's burden to prove the elements of premeditation and deliberation by implying that the mere fact of death by strangulation supplied such proof. Because strangulation is not among the methods of killing expressly established by N.C.G.S. § 14-17 as murder in the first degree, the State must prove premeditation and deliberation. *See State v. Phillips*, 328 N.C. 1, 21, 399 S.E.2d 293, 303 (1991) ("Neither premeditation and deliberation nor intent to kill are elements of murder in the first degree when the homicide is perpetrated by [means enumerated in the statute, including] torture."); *State v. Johnson*, 317 N.C. 193, 203, 344 S.E.2d 775, 781 (1986) (premeditation and deliberation "is not an element of . . . first-degree murder" when the murder is perpetrated by a means enumerated in the statute). "When the State relies on a theory of premeditation and deliberation for first-degree murder, it must prove as necessary elements of the crime that defendant premeditated and deliberated before killing the victim." *State v. Davis*, 325 N.C. 607, 628, 386 S.E.2d 418, 429 (1989), *cert. denied*, --- U.S. ---, 110 L. Ed. 2d 268 (1990).

However, because "premeditation and deliberation are processes of the mind, they are not ordinarily subject to direct proof but generally must be proved if at all by circumstantial evidence." *State v. Huffstetler*, 312 N.C. 92, 109, 322 S.E.2d 110, 121 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). The brutal manner of the killing and the nature of the victim's wounds are circumstances from which the jury can infer premeditation and deliberation. *State v. Jackson*, 317 N.C. 1, 23, 343 S.E.2d 814, 827 (1986), *vacated on other grounds*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987). The jury may infer premeditation and deliberation from the circumstances of a killing, including that death was by strangulation. *State v. Davis*, 325 N.C. at 629, 386 S.E.2d at 429-30 (evidence that defendant assaulted and strangled victim sufficient to withstand motion to dismiss); *State v. Wilson*, 322 N.C. 117, 138-39, 367 S.E.2d 589, 601-02 (1988) (evidence that defendant tied and choked victim sufficient to withstand motion to dismiss); *State v. Vereen*, 312 N.C. 499, 515, 324 S.E.2d 250, 260, *cert. denied*, 471 U.S. 1094, 85 L. Ed. 2d 526 (1985) (evidence of a brutal attack,

sexual assault, and strangulation sufficient to support a finding of premeditation and deliberation); *State v. Strickland*, 307 N.C. 274, 295, 298 S.E.2d 645, 658 (1983) (sufficient evidence of premeditation and deliberation where victim was bound and died of strangulation).

Because the prosecutor was arguing that the jury could infer premeditation and deliberation from the circumstances and manner in which defendant killed the victim, the argument was not an incorrect statement of law, and the trial court did not err in overruling defendant's objection. Further, the trial court instructed:

> [N]either premeditation nor deliberation are usually subsceptible [sic] of direct proof. They may be proved by proof of circumstances from which they may be inferred, such as the brutal or vicious circumstances of the killing, and the manner in which or the means by which the killing was done.
>
> . . . .
>
> . . . [I]f you find from the evidence and beyond a reasonable doubt that on or about the alleged date, the defendant intentionally manually strangled Gladys Byrum and that this proximately caused her death and that the defendant intended to kill Gladys Byrum and that he acted with malice, after premeditation and with deliberation, it would be your duty to return a verdict of guilty of first degree murder on the basis of malice, premeditation and deliberation.

This was a correct statement of the law. This assignment of error is overruled.

**[4]** Defendant finally contends the trial court erred in refusing to give his requested instruction that "with effect to first degree rape, serious personal injury be serious personal injury short of death." Defendant made his request orally after the jury retired. Requests for special instructions "should be submitted in writing to the trial judge at or before the jury instruction conference." Rule 21, General Rules of Practice for the Superior and District Courts. "A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict. . . ." N.C.R. App. P. 10(b)(2). Failure to request or object to instructions before the jury retires waives any objection to the instructions. *State v. Horner*, 310 N.C.

274, 283, 311 S.E.2d 281, 287 (1984); *see also State v. Hewitt*, 295 N.C. 640, 247 S.E.2d 886 (1978). This assignment of error is overruled.

No error.