STATE OF NORTH CAROLINA v. TERRY LYNN JORDAN

No. 555A91

(Filed 12 March 1993)

1. **Evidence and Witnesses § 3025 (NCI4th)— impeachment— limited to prior convictions**

   The trial court did not err in a murder prosecution where a State's witness testified concerning conversations with defendant in jail by limiting defendant's cross-examination of that witness about prior bad acts to questions under N.C.G.S. § 8C-1, Rule 609 concerning prior convictions. Although defendant contends that he was not able to cross-examine the witness about his recent conversion to the pursuit of justice and his facility with deception, the testimony clearly indicates that defense counsel communicated to the jury the issue of the witness's credibility as effectively as if he had proceeded under N.C.G.S. § 8C-1, Rule 608.

   **Am Jur 2d, Witnesses §§ 910, 911.**

   **Construction and application of Rule 609(a) of the Federal Rules of Evidence permitting impeachment of witness by evidence of prior conviction of crime. 39 ALR Fed 570.**

2. **Homicide § 211 (NCI4th)— first degree murder—sufficiency of evidence—cause of death**

   The trial court did not err by denying defendant's motion to dismiss a first degree murder prosecution for insufficient evidence that the shooting of the victim was the proximate cause of death. Although defendant contended that the victim's family and doctor determined that they would not pursue medical options available to them to keep the victim alive, the evidence presented was clearly sufficient to establish that the gunshot wounds inflicted by defendant were the proximate cause of the victim's death. Contradictions in the evidence are for the jury to resolve.

   **Am Jur 2d, Homicide § 432.**

3. **Appeal and Error § 149 (NCI4th)— first degree murder— instructions—error favorable to defendant—no objection —no prejudice**

   There was no plain error in a first degree murder prosecution where the court instructed the jury that the State must

STATE v. JORDAN

[333 N.C. 431 (1993)]

prove that defendant did not act in self-defense. Defendant failed to object at trial and derived the benefit of an instruction to which he was not entitled.

**Am Jur 2d, Appeal and Error § 545.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence entered by Martin (Lester P., Jr.), J., at the 21 August 1991 Criminal Session of Superior Court, Guilford County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 14 January 1993.

*Michael F. Easley, Attorney General, by Mary Jill Ledford, Assistant Attorney General, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

MEYER, Justice.

Defendant was indicted by a Guilford County grand jury on 14 January 1991 for the murder of Kimella Denise Hewett. Defendant was tried capitally in Superior Court, Guilford County, in August 1991, and the jury returned a verdict finding defendant guilty of first-degree murder. Following a sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment. In accordance with the jury's recommendation, Judge Martin sentenced defendant to life imprisonment. Defendant appeals to this Court as of right.

Evidence presented by the State at defendant's trial tended to show the following facts and circumstances. In the early morning hours of 10 January 1991, Patrick Little spotted Kimella Denise Hewett lying on the sidewalk near the corner of Windley and Hoover Streets in front of a house owned by Robert Fair. Fair testified that he heard three gunshots coming from the Hoover Street side of his house sometime before 2:00 a.m. Little called the police, and Officer Bob Morris with the High Point Police Department arrived at the scene at 2:10 a.m. Morris found Hewett lying face down on the sidewalk. Officer Morris saw on the ground two spent .25-caliber cartridges and one .25-caliber cartridge that had not yet been fired.

Hewett, who was still alive, was taken to the High Point Memorial Hospital. The victim died at 9:45 a.m. on 10 January 1991, almost eight hours after she was found. An autopsy of the

STATE v. JORDAN

[333 N.C. 431 (1993)]

victim's body revealed that the victim had five gunshot entrance wounds, all to the back of the body. Three gunshot wounds were to the victim's back, and two were to the back of the victim's head. The pathologist who performed the autopsy testified that, in her opinion, the cause of death was multiple gunshot wounds.

At the time the victim died, Willie Brooks was the victim's boyfriend and had been dating her for about three months. Prior to that, the victim had been dating the defendant. In November of 1990, Brooks accompanied the victim to court in High Point regarding assault charges filed by the victim against defendant. The case was continued to 14 January 1991. After the November 1990 court appearance, defendant called the victim. Brooks answered the phone, and when defendant asked to speak to the victim, Brooks asked defendant why he would not leave the victim alone. Defendant responded to Brooks, saying, "Let me tell you something. If I can't have Kim, you can't have her. Before I let you have her I'll kill her." Brooks then hung up the phone.

About two or three months prior to the killing, defendant called a co-worker, John Flowers, and asked to borrow his gun. Flowers told defendant he could not use it. Approximately a month before the killing, defendant told Flowers that he and the victim were "having a little difficulty, problems and stuff." Defendant told Flowers that the victim had a new boyfriend and that he was "kind of upset." Defendant told Flowers that if he (defendant) could not have the victim, "nobody else [would]." Defendant said that "he would kill her or something like that."

A few weeks before the killing, defendant showed Michael Lorenzo Brown a pistol and asked Brown where he could get some bullets. Brown told defendant that he could get bullets at Rose's or K Mart. Two weeks prior to the killing, defendant showed Christopher Keith Archie, a co-worker and a relative by marriage, a gun that defendant said he found at a nightclub. Defendant asked Archie how to kill someone, and Archie responded that he did not know. Defendant told Archie that he was going to go to court and did not want to go to jail. Defendant told Archie that he was going to kill someone, but Archie did not think defendant was talking about the victim.

On 27 December 1990, defendant purchased CCI .25-caliber handgun ammunition from the K Mart on North Main Street in High Point. Tina Mixon, the clerk in the sporting and automotives

department who sold defendant the ammunition, took special notice of defendant because she did not often sell handgun ammunition.

On the evening of 9 January 1991, Brooks and the victim had dinner together and went to the home of Brooks' stepmother, who lived approximately three blocks from the victim. At approximately 1:15 a.m. on the morning of 10 January 1991, the victim left to return home, arriving a short time later. Defendant was waiting outside of her house. He pulled out his gun, and the victim said, "Oh, God, what are you going to do?" Defendant responded that he wanted to talk to her. She said "Okay," and they began talking. Defendant asked her where she had been and asked her if she had been with another man. The victim responded in the affirmative, and they began arguing. Defendant attempted to get the victim to go to his car, but the victim said, "If you're going to kill me, you're going to have to do it here." The victim turned around and walked away. Defendant fired the gun, hitting the victim in the back. The victim fell to the ground, and defendant aimed the gun at her head and shot the victim four more times.

Defendant arrived at work later that morning at approximately 3:00 a.m. Defendant was four hours late and appeared nervous. Defendant asked Alvin Jessie Thompson, Jr., a co-worker, numerous questions. Defendant asked Thompson, "How do you get rid of powder burns?" Defendant inquired of Thompson, "If you shot somebody from about five to ten feet, could they—if they didn't die, could they testify against you?" Defendant asked Thompson, "If you shot somebody twice in the head and twice in the back, would they live?" Defendant continued questioning Thompson, saying, "If I was standing here, and somebody was standing there, and you take and shoot somebody like [making a motion as if pointing a gun] . . . . If you shoot somebody and you're standing— . . . pow, pow, pow, would they live or could they testify against you?"

Defendant presented no evidence at the guilt phase of the trial.

Additional facts will be discussed as necessary for the proper disposition of the issues raised by defendant.

[1]  By his first assignment of error, defendant contends that the trial court erred by limiting defendant's cross-examination of State's witness Hairston about prior bad acts to questions about prior

convictions under N.C.G.S. § 8C-1, Rule 609. Brian William Hairston, III, testified for the State regarding conversations he had with defendant while he and defendant were in jail. Hairston testified that defendant told him that he and his girlfriend (the victim) were "having a lot of problems before he had did the incident." Defendant told Hairston that the victim had filed some assault charges against him, that he (defendant) had been following her around the city, and that she "was messing around with another guy or something." Hairston testified that defendant was "getting upset about it, and he tried to talk to her about it and she had refused to listen to him so he knocked her off. . . . He knocked her off, killed her. . . . Shot her in the head."

On cross-examination, defense counsel sought to discredit Hairston's testimony by questioning him about prior specific instances of conduct, which defendant argues was probative of truthfulness.

Q. Let's go back to December. In December you forged a check from the account of Robbie Ingram, didn't you?

A. Yes, I did.

. . . .

Q. And when you were doing that you knew what you were doing, didn't you?

A. Yes, I did.

Q. You knew it was wrong, didn't you?

A. Yes.

Q. You didn't care about Mr. Ingram, did you?

A. I didn't know Mr. Ingram.

At this point, the prosecutor objected, and the trial court sustained the objection. A bench conference was held, and defense counsel argued that the questioning was permissible pursuant to Rule 608(b) of the North Carolina Rules of Evidence. The prosecutor argued that the cross-examination should be limited to prior criminal convictions pursuant to Rule 609 of the North Carolina Rules of Evidence. The trial court agreed and ruled that defense counsel would be limited to questioning Hairston about prior convictions under Rule 609.

A voir dire examination of Hairston was conducted by the prosecution, wherein Hairston stated that he had been convicted of felony larceny, credit card theft, thirteen counts of forgery and uttering, and driving without a license. Following this voir dire examination, defense counsel made an offer of proof. When questioned, Hairston stated that his purpose for coming forward about what defendant had told him was "justice." Hairston admitted that when he committed forgery, credit card theft, and larceny, justice was not his goal.

The jury returned, and defense counsel resumed its cross-examination of Hairston.

Defendant contends that the trial court erred by limiting the cross-examination of Hairston about his prior acts to cross-examination concerning prior convictions under Rule 609 and thereby prevented defense counsel from questioning Hairston about his "recent pursuit of justice and his facility with deception" under Rule 608(b). We disagree. Rule 608(b) reads, in pertinent part:

(b) *Specific instances of conduct.* — Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

N.C.G.S. § 8C-1, Rule 608(b) (1992). As the rule provides, it is within the trial court's discretion to allow or disallow cross-examination of a witness about his specific acts if the acts are relevant to his character for truthfulness or untruthfulness. *See also State v. Morgan*, 315 N.C. 626, 340 S.E.2d 84 (1986). In *Morgan*, we held that prior to admitting evidence under Rule 608(b), "the trial judge must determine, *in his discretion*, . . . that the probative value of the evidence is not outweighed by the risk of unfair prejudice, confusion of issues, or misleading the jury, and that the questioning will not harass or unduly embarrass the witness." *Id.* at 634, 340 S.E.2d at 90 (emphasis added). A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned

decision. *State v. Barts*, 316 N.C. 666, 343 S.E.2d 828 (1986); *State v. Hayes*, 314 N.C. 460, 334 S.E.2d 741 (1985).

The record indicates that the trial judge articulated two primary bases for disallowing questioning of Hairston pursuant to Rule 608. First, the court indicated its concern about the amount of time such an inquiry would require:

> THE COURT: . . . : Let's restrict it. I don't want you to go off on a tangent here and be here all day asking this witness all about his past history and that sort of thing. We could be here forever. Let's hold it down to the usual procedure of past convictions.

Second, the trial court stated that defendant's objective could be accomplished under the trial court's ruling:

> MR. HAMMER [Defense Counsel]: I don't plan to question him on every little thing he's ever done because we would be here more than an afternoon, I guarantee you that.

> THE COURT: I understand. That's why I would like to, in my discretion, bar you from going into all of that. I think you can accomplish the same purpose by following the usual rule under 609.

We believe that the record clearly indicates that the trial court did not abuse its discretion.

On cross-examination, pursuant to Rule 609, which allows a party to impeach a witness by evidence of prior convictions, Hairston testified that he had been convicted of larceny and credit card theft and that he had been in jail on charges of forgery and uttering. Hairston maintained that his purpose for coming forward and testifying against defendant was "justice." Hairston testified, however, that after informing the district attorney about his conversations with defendant, he was released from jail on a promise to appear. Hairston admitted that despite the fact that he had made a promise to appear and a promise not to break the law, upon his release, new charges were filed against him for first-degree sexual offense, kidnapping, and armed robbery. Hairston further admitted to being charged with selling counterfeit controlled substances, and when Hairston testified that he did not remember whether he was convicted of those charges, defense counsel refreshed his memory as to his voir dire testimony to the contrary. Defense counsel elicited

testimony from Hairston which implied to the jury that he had misrepresented his mental condition while in jail in order to be sent to Dorothea Dix Hospital. Hairston testified that he "wanted to be able to walk around, breathe some air." Hairston further admitted to knowing that he was HIV positive since 1988 and that he was currently being held for a sexual offense on a young man.

Although defendant contends that he was not able to cross-examine Hairston about his recent conversion to the pursuit of justice and his facility with deception, this testimony clearly indicates that defense counsel communicated to the jury the issue of Hairston's credibility as effectively as if he had proceeded under Rule 608. This assignment of error is overruled.

[2]  In his next assignment of error, defendant contends that the trial court erred in denying defendant's motion to dismiss the charge of first-degree murder for insufficiency of the evidence. By this assignment of error, defendant contends that there was insufficient evidence to show that the shooting of the victim was the proximate cause of her death. Defendant relies on the following portion of testimony given at trial by Russell Blaylock, the neurosurgeon who examined the victim when she was brought to the hospital:

Q. When did she die?

A. She lived throughout the night and died the next morning.

Q. About what time?

A. I think she was pronounced dead at nine-fifty a.m.

Q. Could anything medically within reason be done for her?

A. No. I discussed with the family the massive nature of her brain injury, and they decided, along with me, that there was no further course that we could take to try to save her life or bring her any kind of useful life.

Defendant argues, based on this testimony, that Dr. Blaylock and the victim's family determined that they would not pursue medical options available to keep the victim alive and therefore that the trial court erred in denying his motion to dismiss for insufficiency. We disagree. The law is well settled that when reviewing challenges to the sufficiency of the evidence in criminal trials, we must view the evidence in the light most favorable to the State. *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). The State

receives the benefit of all reasonable inferences, and any contradictions or discrepancies are for the jury to resolve. *Id.* To hold a person criminally responsible for a homicide, the State must prove that his act caused or directly contributed to the death. *State v. Luther*, 285 N.C. 570, 206 S.E.2d 238 (1974).

The evidence presented in this case was clearly sufficient to establish that the gunshot wounds inflicted by defendant were the proximate cause of the victim's death. Pathologist Deborah L. Radish testified that the victim received five gunshot wounds to her back and head. One gunshot wound was to the victim's right upper back. This bullet went into the right chest, through her right lung, through her body to the left, and through the left carotid artery and was recovered from the victim's body below her left collar bone. A second bullet went into and through the muscle tissue of the victim's left back and was recovered from the victim's middle back. A third bullet entered the victim's back and went into the victim's abdominal cavity, through the small intestine several times, and through the large intestine and was recovered from the muscle tissue of the abdominal wall. A fourth bullet chipped the victim's skull. A fifth bullet went into the scalp, through the skull bone on the back of the head, through the left side of the brain, crossing over the midline of the brain towards the front, and exiting the right front of the brain. This bullet was recovered from between the dura and the brain. Dr. Radish testified that, in her opinion, the cause of death was multiple gunshot wounds. This evidence was clearly sufficient to allow the jury to find that the victim's death was caused by the shots fired by defendant into her body and head. Any contention by defendant that the testimony of Dr. Blaylock indicates some independent and intervening cause of the victim's death, even if supported by the evidence, amounts to nothing more than an argument that there exists a contradiction in the evidence. Thus, we conclude that the trial court did not err in denying defendant's motion to dismiss, as " 'contradictions and discrepancies do not warrant dismissal of the case — they are for the jury to resolve.' " *State v. Benson*, 331 N.C. at 544, 417 S.E.2d at 761 (quoting *State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982) ).

[3] As his final assignment of error, defendant contends that the trial judge committed prejudicial error when, in instructing on the elements of first-degree murder, he instructed the jury that the State must prove that defendant did not act in self-defense.

We disagree. Defendant failed to object to the challenged instruction at trial, and thus, any error must be reviewed under the plain error rule. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result. *State v. Faison*, 330 N.C. 347, 411 S.E.2d 143 (1991).

In *State v. Bush*, 307 N.C. 152, 297 S.E.2d 563 (1982), after determining that there was no evidence that would have supported a finding that the defendant formed a reasonable belief that it was necessary to kill in order to protect himself from death or great bodily harm, we held:

> [T]he trial court erred in giving the jury any instructions relative to self-defense. This error was favorable to the defendant and clearly harmless to him beyond a reasonable doubt, since it resulted in the jury giving consideration to acquittal upon a ground which the defendant was not entitled to have the jury consider. When a trial court undertakes to instruct the jury on self-defense in a case in which no instruction in this regard is required, the gratuitous instructions on self-defense are error favorable to the defendant even though they contain misstatements of law which would constitute reversible error in a case in which instructions on self-defense were required by the evidence. As the defendant in the present case was not entitled to any jury instructions on self-defense, any mistakes by the trial court in its instructions on self-defense were, at worst, harmless error not necessitating a new trial.

*Id.* at 161, 297 S.E.2d at 569 (citation omitted). Applying these principles to the case at bar, we conclude that defendant derived the benefit of an instruction to which he was not entitled and cannot demonstrate that this error was prejudicial to him. This assignment of error is overruled.

For the reasons stated above, we find that defendant received a fair trial free of prejudicial error.

NO ERROR.