IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-333

Filed 19 February 2025

Johnston County, Nos. 20CRS54338, 22CRS347, 22CRS580-81

STATE OF NORTH CAROLINA

v.

ZUAMMETT VELASCO

Appeal by defendant from judgment entered 3 February 2023 by Judge Rebecca W. Holt in Johnston County Superior Court. Heard in the Court of Appeals 28 January 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Sherri Horner Lawrence, for the State.*

*Mark Montgomery, for the defendant-appellant.*

TYSON, Judge.

Zuammett Velasco ("Defendant") appeals from judgment entered upon the jury's verdicts finding her guilty of first-degree forcible rape, first-degree forcible sexual offense, sexual servitude of a child victim, and incest of her daughter. We dismiss her waived first argument concerning pattern jury instructions on flight and discern no plain error in her remaining argument on appeal.

## I. Background

Katy was born on 23 December 2002. *See* N.C. R. App. P. 42(b) (pseudonyms

used to protect the identity of all minors and victims). Defendant is Katy's biological mother. Defendant and Katy's father procreated five children. Defendant was married to Katy's father until 2018. When Katy's parents divorced, Defendant left the family home.

In 2020, Katy lived with her biological father, stepmother, and three of her siblings, including her younger sister, Penny. Katy's older sibling, Zoey, had reached the age of majority, moved out, and was living with her boyfriend, Roman. Defendant married Gamaliel Hernandez Velasco ("Gamaliel"), who is between ten and twenty years younger than Defendant, in 2020 or 2021.

Katy had first met Gamaliel when she was celebrating her birthday with Defendant in 2018. Defendant had picked out a dress for Katy to wear. Gamaliel touched and complimented Katy's hair and told Katy how much her appearance resembled Defendant. Defendant told Katy to dance with Gamaliel. Katy agreed, despite feeling uneasy about the situation. While dancing, Gamaliel rubbed his knee outside her clothing against the area of Katy's vagina.

Defendant drove Katy back to her father's house that evening. Katy sat in the front passenger seat, and Gamaliel rode in the backset. Gamaliel touched Katy's hair and inserted his finger inside of Katy's mouth while Defendant was driving. The next day, Defendant called and Katy told her about this incident over the phone. Defendant asked Katy why she had waited to tell her. Katy explained she was "just scared" because she knew Defendant's relationship with Gamaliel "was tough" and

she did not "want to get hurt or see [Defendant] get hurt in front of [her]." Defendant told Katy she was not on good terms with Gamaliel.

On 28 August 2020, Katy and her younger sister, Penny, snuck out of their father's house to spend time with Defendant. Defendant had told Penny she wanted to see her. Katy and Penny walked through their neighbor's yard, where Defendant was waiting for them in her car with Gamaliel. Katy and Penny were confused when they saw Gamaliel sitting inside the vehicle, because they were not expecting him to be there.

Defendant planned to consume alcohol and "party" with her daughters that evening. Defendant gave Penny and Katy a marijuana gummy while in the car. When they arrived at the house, Defendant gave them shots of tequila and vodka. The two girls also left Defendant's house with Defendant to purchase more alcohol at a gas station, although Katy was outside the gas station when the alcohol was purchased.

At some point after midnight, Katy started to feel sick. Katy testified: "I felt dizzy. Not really dizzy, but the room was like spinning to me. So I felt really nauseous, and I went to the bathroom, and I had to throw up." Eventually, Penny and Defendant joined Katy in the bathroom. Defendant told Penny and Katy to clean their vaginas, and she washed her own in the bathtub.

Penny went to Defendant's room to go to sleep, but Katy was taken to Gamaliel's bedroom to lie down. Gamaliel started cuddling Katy and rubbing the

clothing over her vagina with his hand. Katy tried to tell Gamaliel to stop, but he would not stop. He stopped for a moment, and Defendant entered the room. Katy grabbed Defendant's hand and asked for some water, although she did not want Defendant to leave the room. Katy testified, "I just looked at her in her eyes, and I squeezed her hand to mean[,] that was me telling her that I need her, and then she left, and she came back with more drinks. With two shot glasses. And I started crying and I told her no." Katy did not drink either of the liquor shots.

When Defendant left the room, Gamaliel inserted his hand underneath Katy's underwear and inserted his fingers inside her vagina and inside her rectum. He also started touching her breasts. At some point, Defendant returned to the room. Defendant performed oral sex on Gamaliel with Katy present.

At some point, Defendant brought scissors into the bedroom. Defendant told Gamaliel, "I know you want to. You can do it." Defendant left the bedroom. When Defendant left the room, Gamaliel used the scissors to cut off Katy's clothing. Gamaliel performed oral sex on Katy. He also "suck[ed] on [her] neck."

Defendant returned to the room with Gamaliel's cellphone. Gamaliel asked Defendant to take pictures. Katy saw the flashes, even though her eyes were closed. When Gamaliel's phone battery started to die, Defendant used her cellphone to take more pictures.

While Defendant was taking pictures, Gamaliel inserted his penis inside of Katy's vagina. He touched Katy everywhere on her body and "kissed" her. Katy

- 4 -

testified, "And then next thing he did was put me on top of him, and controlled me that way. And then he – my mom came back to the room, and he laid me back down and continued. He continued. I don't know how long it went for." Defendant eventually told Gamaliel to stop. Defendant brought Katy different clothes and dressed her.

Defendant and Gamaliel drove Katy and Penny to their neighbor's backyard and dropped them off. Katy realized she had lost her house keys, so she texted her brother and asked him to let them into the house. Katy decided to lie on the grass while she waited for her brother to unlock the door. After her brother let Katy and Penny inside the house, Katy slept for a couple of hours. Katy did not say anything to her brother or to Penny about what Gamaliel and Defendant had done.

When Katy awoke, she went downstairs and cried alone on the floor. After she composed herself, she went to the bathroom and saw a mark on her neck in the mirror. Katy called her older sister, Zoey. When Zoey did not answer the phone, she called Zoey's boyfriend, Roman, and told him what had happened.

Zoey and Roman met Katy at her father's house, and Katy told Zoey of the assaults by Gamaliel and Defendant. Zoey angrily called Defendant and spoke with her on the phone. During that phone conversation, Zoey threatened to notify law enforcement. Defendant denied anything had happened to Katy. Defendant contacted Katy by texting Penny's cell phone, because Katy had blocked Defendant

on her cell phone and social media. Katy sent Defendant text messages using Penny's cell phone.

Zoey and Roman drove Katy and Penny to the fire department. After speaking to a sheriff's deputy for approximately thirty minutes, she was transported to WakeMed. Katy called her father, while she was on the way to the hospital, and he met her there. Katy was worried her father would be angry at her for sneaking out, but he was not angry and instead "he held [her], and said it's going to be all right." Katy was initially examined at WakeMed and then referred to a sexual assault center for further testing.

Defendant did not return to work after 28 August 2020, the night of the events and allegations. Before Defendant and Gamaliel could be arrested, they fled from Johnston County. They were located and arrested a month later in Indio, California, and returned to North Carolina.

On 16 May 2022, Defendant was indicted for first-degree forcible rape, first-degree forcible sexual offense, sexual servitude of a child victim, and incest. A trial was held on 23 January 2023. Katy, Katy's Father, Penny, Zoey, Roman, and Defendant testified at trial.

Zoey, Katy's older sister, was born in 1997 and was twenty-five years old at the time of trial. She testified as a character witness and corroborated Katy's testimony, and she also recounted the events that occurred after Katy had told Roman and her about Gamaliel's assaults and the crimes committed against her.

Zoey continued to have a good relationship with Defendant after Defendant had moved out of the family home. When Zoey was twenty-one years old, Zoey visited Defendant at her apartment in Knightdale, and she met Gamaliel for the first time. Zoey went to see Defendant because she was upset after she had failed to pass her phlebotomy examination. Defendant picked Zoey up from her biological father's house and took her back to her Knightdale apartment. Defendant gave Zoey her first alcoholic drink, which was multiple shots of Vodka. Defendant and Zoey danced to Spanish music. To Zoey's surprise, Gamaliel walked into the apartment. Gamaliel told Zoey she resembled Defendant and inquired about her age as they continued to drink Vodka shots.

Zoey and Defendant danced together until Defendant asked Zoey to dance with Gamaliel. Zoey agreed and danced with him. Zoey used her cellphone to reply to a SnapChat message with a video, which revealed she was dancing with Gamaliel. At some point, Zoey's friends told her they were coming to pick her up.

Zoey felt dizzy and decided to lie down on Defendant's bed. Defendant walked out of the room as Gamaliel walked into the room, and Gamaliel lay down on the bed with Zoey. Gamaliel cuddled Zoey and started rubbing her thighs and reaching for her breasts. Zoey pushed Gamaliel away and called for Defendant. Defendant entered the room, and Gamaliel sat up. Defendant brought Zoey some water.

Zoey's boyfriend and biological father started looking for Zoey by banging on random doors in Defendant's apartment complex. While Zoey was waiting, Gamaliel

asked Zoey, "Do you want to f*ck me?" Zoey replied "no", got up, went to the door, and told Defendant she had to go. Zoey left Defendant's apartment and found her biological father and her then-boyfriend downstairs. Zoey told Defendant the next day what had happened with Gamaliel and how it had made her feel uncomfortable. Defendant was upset, but told Zoey not to worry about it because she would handle it.

A few months later, Zoey visited Defendant at her apartment because she wanted to maintain a relationship with her mother. Defendant had told Zoey that Gamaliel would not be there, but he was present. After Zoey and Defendant spent the day drinking together at the pool, Gamaliel came to the apartment after work. While Zoey was talking to Roman on the phone, Gamaliel asked Zoey, in an angry tone, who she was talking to and why she was talking to them. Zoey told Gamaliel to leave her alone and not to touch her, because he had brushed her hair. Gamaliel grabbed Zoey's phone and hung up on Roman. After this encounter, Zoey again told Defendant she did not feel comfortable being around Gamaliel. Defendant again assured Zoey she would talk to Gamaliel and deal with it.

Other individuals outside of Katy's family also testified: the Sheriff's Sergeant with whom Katy had first reported the assault; the detective who had met with Katy at WakeMed; the nurse practitioner at WakeMed, who had examined Katy; the sexual assault nurse who had met with Katy at the sexual assault center; several other detectives, who investigated the case and collected evidence; and several expert

witnesses, who collected DNA evidence and completed the requisite testing.

Beatriz Pujols ("Pujols"), a forensic scientist in the forensic biology section of the North Carolina State Crime Laboratory, testified as an expert in bodily fluid identification, DNA analysis, and DNA interpretation. Pujols conducted a DNA analysis of the sexual assault evidence collection kit containing multiple body swabs, hair samples, and underpants from Katy. The profile obtained from collections of Katy's right breast swabs and left neck swabs matched Gamaliel's DNA profile. Notably, these swabs were collected after Katy had changed her clothes, been driven back to her father's home, waited in the yard for her brother to let her into the house, had slept for several hours, spoken with Zoey and Roman, given her testimony to the Sheriff, and finally been escorted to the hospital.

Pujols opined Gamaliel Hernandez Velasco was the second contributor to the profile generated from Katy's left neck swab: "The partial DNA profile obtained from the right breast swab is approximately 199 quintillion times more likely it originated from [Katy] and Hernandez Gamaliel Velasco, than it originated from [Katy] in an unknown, unrelated individual." Pujols further opined: "[T]he statistics for this item are the DNA profile obtained from the left neck swab is approximately 1.16 nonmillion times more likely it originated from [Katy] and Hernandez Gamaliel Velasco, than it originated from [Katy] [and] an unknown, unrelated individual."

Detective C.J. House ("Det. House") searched Defendant's and Gamaliel's apartment. Det. House found "a pair of blue in color panties that obviously had been

damaged or cut" and "a pair of pants that were obviously cut" in Defendant's trash can. At least ten empty bottles of alcohol were found in Defendant's trash can, and more alcohol was found in the refrigerator.

The jury found Defendant guilty of all four crimes of which she was indicted. Defendant was sentenced as a prior record level I offender to 240 to 348 months for first-degree forcible rape, 240 to 348 months for first-degree forcible sexual offense to run consecutively to her first-degree forcible rape sentence, and to 73 to 148 months for incest and sexual servitude, which were both consolidated and set to run concurrently to Defendant's prior two sentences. Each of Defendant's sentences were within the presumptive range. Defendant entered oral notice of appeal in open court.

## II.    Jurisdiction

This Court possesses jurisdiction to review a final judgment entered in a criminal case pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-1444(a) (2023).

## III.    Issues

Defendant argues the trial court erred by: (1) omitting a parenthetical phrase from the pattern jury instructions for flight; and, (2) instructing the jury on aiding and abetting because she is Katy's biological mother and was present in the home when the alleged incidents occurred.

## IV.    Jury Instruction on Flight

Defendant argues the trial court erred by omitting the parenthetical phrase from the first sentence of the pattern jury instruction on flight, which states: "The

State contends (and the Defendant denies) that the defendant fled." N.C.P.I.–Crim. 104.35 (June 2021).

Rule 10(a)(1) of the North Carolina Rules of Appellate Procedure requires: "In order to preserve an issue for appellate review, the appellant must have raised that specific issue before the trial court to allow it to make a ruling on that issue." *Regions Bank v. Baxley Com. Props., LLC*, 206 N.C. App. 293, 298-99, 697 S.E.2d 417, 421 (2010) (citing N.C. R. App. P. 10(a)(1)).

In criminal cases, this Court may review unobjected-to instructional and evidentiary errors for plain error. *State v. Lawrence*, 365 N.C. 506, 512-16, 723 S.E.2d 326, 330-33 (2012) (explaining "[u]npreserved error in criminal cases, on the other hand, is reviewed only for plain error" and "plain error review in North Carolina is normally limited to instructional and evidentiary error" (citations omitted)).

A defendant must "specifically and distinctly" argue "an issue that was not preserved by objection . . . amount[ed] to plain error." N.C. R. App. P. 10(a)(4). Additionally, "[a] party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection[.]" N.C. R. App. P. 10(b)(2).

Failure to allege plain error regarding an unpreserved issue waives all appellate review. *State v. Benner*, 380 N.C. 621, 638, 869 S.E.2d 199, 210 (2022); *Davignon v. Davignon*, 245 N.C. App. 358, 361, 782 S.E.2d 391, 394 (2016) ("It is well-

settled that arguments not presented in an appellant's brief are deemed abandoned on appeal." (citing N.C. R. App. P. 28(b)(6)).

Here, Defendant failed to preserve her argument asserting the trial court should have included the parenthetical phrase "(and the defendant denies)" in the jury instruction on flight. Defendant failed to "specifically and distinctly" contend the issue she purportedly raised on appeal "amount[ed] to plain error." N.C. R. App. P. 10(a)(4). Defendant presents this argument for the first time on appeal. N.C. R. App. *Id.*; *Regions Bank*, 206 N.C. App. at 298-99, 697 S.E.2d at 421; *State v. Richardson*, 328 N.C. 505, 514, 402 S.E.2d 401, 407 (1991). Defendant's argument regarding this issue is waived and dismissed. *Benner*, 380 N.C. at 638, 869 S.E.2d at 210; *Davignon*, 245 N.C. App. at 361, 782 S.E.2d at 394; N.C. R. App. P. 28(b)(6).

## V. Jury Instruction on Aiding and Abetting

Defendant next argues the trial court erred by instructing the jury on aiding and abetting. Defendant argues the trial court's inclusion of this instruction was based solely on her being Katy's biological mother and being present in the home when the alleged incidents occurred.

### A. Standard of Review

This Court reviews unpreserved instructional errors using the plain error standard of review. *Lawrence*, 365 N.C. at 512, 723 S.E.2d at 330. A defendant has failed to preserve an issue for appellate review if the argument was not raised before the trial court. *See Regions Bank*, 206 N.C. App. at 298-99, 697 S.E.2d at 421 (citing

N.C. R. App. P. 10(a)(1)).

"The specific grounds for objection raised before the trial court must be the theory argued on appeal because 'the law does not permit parties to swap horses between courts in order to get a better mount in the [appellate court].' " *State v. Harris*, 253 N.C. App. 322, 327, 800 S.E.2d 676, 680 (2017) (quoting *Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934)).

In appeals of criminal cases, this Court may review unobjected-to instructional and evidentiary errors for plain error. *Lawrence*, 365 N.C. at 512-16, 723 S.E.2d at 330-33. As noted, Defendant must "specifically and distinctly" argue "an issue that was not preserved by objection . . . amount[ed] to plain error." N.C. R. App. P. 10(a)(4).

Plain error is defined as:

> a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where the error is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial[,] or where the error is such as to seriously affect the fairness, integrity[,] or public reputation of judicial proceedings[,] or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citations, quotation marks, and alterations omitted). "To show that an error was fundamental, a defendant must establish prejudice." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334.

"Under the plain error rule, defendant must convince this Court not only that

there was error, but that absent the error, the jury probably would have reached a different result[.]" *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993) (citation omitted).

Here, Defendant failed to object and preserve her argument on appeal. At trial, Defendant objected to a specific portion of the jury instructions for the crime of first-degree forcible rape (multiple assailants). N.C.P.I.–Crim. 207.10A (June 2020). The second element of that crime requires the State to prove beyond a reasonable doubt "that the defendant **aided and abetted** another to use or threatened to use force sufficient to overcome any resistance the alleged victim might make." The State asked for the following jury instructions to be included:

> Constructive force can be inferred from a parent-child relationship between the defendant and the victim. State v. Etheridge, 319 N.C. 34 (1987); State v. Mueller, 184 N.C. App. 553, 567-69 (2007); Locklear, 172 N.C. App. 249; State v. Corbett, 154 N.C. App. 713 (2002); State v. Hardy, 104 N.C. App. 226 (1991).

> Constructive force may also be inferred when one engages in sex acts with a person who is unable to consent due to mental incapacity or physical helplessness. See State v. Washington, 131 N.C. App. 156 (1998); State v. Dillard, 90 N.C. App. 318, 368 S.E.2d 442, 1988 N.C. App. LEXIS 529 (1988).

(citations and format original). Defendant presented arguments before the trial court challenging the inclusion of this language in the jury instruction for the second element of first-degree forcible rape.

Aside from the second element of aiding and abetting in first-degree forcible

rape, the jury was also instructed on aiding and abetting concerning each of the four crimes Defendant was being tried for. After the jury was instructed on the elements for each of those crimes, a separate section was provided entitled "Aiding and Abetting – Parent." Those instructions, which were discussed during the jury charge conference and later read four times to the jury, included the following:

> The failure of a parent who is present to take all steps reasonably possible to protect his or her child from attack or sexual assault by another person constitutes an act of omission by the parent showing the parent's consent and contribution to the crime[,] and thus is sufficient to support a conviction based on aiding and abetting. State v. Walden, 306 N.C. 466 (1982); State v. Ainsworth, 109 N.C. App. 136 (1993).

(citations and format original). Defendant failed to object to these instructions.

On appeal, Defendant presents arguments concerning the latter aiding and abetting jury instruction, and Defendant's brief cites the above jury instruction *verbatim*. Defendant does, however, also argue the trial court committed plain error if the Court concludes her argument was not preserved at trial. We review Defendant's argument for plain error. N.C. R. App. P. 10(a)(1)-(2), (4); *Lawrence*, 365 N.C. at 512, 723 S.E.2d at 330; *Regions Bank*, 206 N.C. App. at 298-99, 697 S.E.2d at 421 (citing N.C. R. App. P. 10(b)(1)); *Harris*, 253 N.C. App. at 327, 800 S.E.2d at 680.

## B. Analysis

Defendant must demonstrate "that absent the error, the jury probably would have reached a different result[.]" *Jordan*, 333 N.C. at 440, 426 S.E.2d at 697

(citation omitted). The Court in *State v. Walden* addresses whether a parent has a duty to protect their child from the commission of a crime and, if so, what actions are sufficient to support a conviction for aiding and abetting. 306 N.C. 466, 293 S.E.2d 780 (1982). Our Supreme Court explained the "trial court was, of course, correct in perceiving that whether a general legal duty of parents exists in such cases is a question of law to be determined by the trial court and stated to the jury, rather than a question of fact for the jury." *Id.* at 474, 293 S.E.2d at 785 (citation omitted). Thus, instructing the jury on a parent's duty to protect their children is a legal question and not a factual one. *Id.*

The Court in *Walden* further held "to require a parent as a matter of law to take affirmative action to prevent harm to his or her child or be held criminally liable imposes a reasonable duty upon the parent." *Id.* at 475, 293 S.E.2d at 786. This duty "has always been inherent in the duty of parents to provide for the safety and welfare of their children, which duty has long been recognized by the common law and by statute." *Id.* While parents do not have a "legal duty to place themselves in danger of death or great bodily harm in coming to the aid of their children[,]" they "do have the duty to take every step reasonably possible under the circumstances of a given situation to prevent harm to their children." *Id.*

*Walden* also provided a final caveat:

> It remains the law that one may not be found to be an aider and abettor, and thus guilty as a principal, solely because he is present when a crime is committed. It will still be

> necessary, in order to have that effect, that it be shown that the defendant said or did something showing his consent to the criminal purpose and contribution to its execution.

*Id.* at 476, 293 S.E.2d at 786-87 (citations omitted).

Even if the trial court's omission of the final caveat in *Walden* was error, Defendant has failed to demonstrate the trial court committed plain error. *See Odom*, 307 N.C. at 660-61, 300 S.E.2d at 378. The State presented a plethora of evidence at trial tending to show Defendant "said or did something showing h[er] consent to the criminal purpose and contribution to its execution." *Walden*, 306 N.C. at 476, 293 S.E.2d at 786-87.

Katy testified she heard Defendant tell Gamaliel, "I know you want to. You can do it." Defendant brought scissors to Gamaliel to cut off Katy's underwear and outer clothing and allegedly took photos while Gamaliel was raping her. Defendant helped Katy sneak out of her father's house, served her alcohol while underage, and provided her with marijuana gummies, all of which made her nauseous, dizzy, disoriented and made it easier for Gamaliel to sexually abuse Katy. Defendant has failed to show error or plain error to establish, "absent [any purported] error, the jury probably would have reached a different result." *Jordan*, 333 N.C. at 440, 426 S.E.2d at 697.

## VI. Conclusion

Defendant received a fair trial, free from plain and prejudicial errors she preserved and argued on appeal. She has failed to show plain error by failing to

demonstrate "the jury probably would have reached a different result[.]" *Id.* We discern no prejudicial or reversible error in the jury's verdicts or in the judgments entered thereon. *It is so ordered.*

NO ERROR.

Judges CARPENTER and FREEMAN concur.