IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-1164

 Filed: 15 October 2019

Pasquotank County, No. 16CRS050016

STATE OF NORTH CAROLINA

 v.

HAROLD CLYDE GRIFFIN, JR.

 Appeal by Defendant from judgment entered 29 March 2018 by Judge Wayland

J. Sermons, Jr., in Pasquotank County Superior Court. Heard in the Court of Appeals

9 May 2019.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Adren
 L. Harris, for the State-Appellee.

 Leslie Rawls for Defendant-Appellant.

 COLLINS, Judge.

 Defendant appeals from judgment entered upon a jury’s verdict finding him

guilty of first-degree murder. Defendant contends the trial court plainly erred by

admitting the expert opinion testimony of a forensic firearms examiner because the

opinion testimony did not satisfy the standards for expert opinion under the North

Carolina Rule of Evidence 702, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509

U.S. 579 (1993), and State v. McGrady, 368 N.C. 880, 787 S.E.2d 1 (2016). We discern

no error.
 STATE V. GRIFFIN

 Opinion of the Court

 I. Procedural History

 On 11 January 2016, Defendant Harold Clyde Griffin, Jr., was indicted on the

charge of first-degree murder for the killing of Timothy Leon Stokley, III. On 26

March 2018, Defendant’s case came on for trial upon his not guilty plea. That same

day, the jury returned a verdict finding Defendant guilty of first-degree murder. The

trial court entered judgment upon the jury’s verdict, sentencing Defendant to life in

prison without the possibility of parole. From entry of judgment, Defendant gave oral

notice of appeal.

 II. Factual Background

 The evidence presented at trial tended to show the following: On the night of

30 December 2015, several individuals, including Defendant, Jessica Skinner, and

Lela Reid, decided to go out partying. The party began at Defendant’s home, where

they hung out and drank alcohol in Defendant’s front yard. Skinner and Reid noticed

a “dark-skinned man with dreads” speaking with Defendant; they soon learned that

the man was Stokley.

 Approximately 20 minutes after introducing Skinner and Reid to Stokley,

Defendant asked Skinner to give Stokley a ride home. Skinner sat in the driver’s seat

of her Trailblazer SUV; Reid sat in the front, passenger-side seat; Defendant sat in

the back, passenger-side seat; and Stokley sat in the back, driver-side seat behind

Skinner.

 -2-
 STATE V. GRIFFIN

 Opinion of the Court

 At some point, Skinner pulled the Trailblazer off of the road and stopped next

to a field. Skinner and Reid had consumed quite a few beers and needed to use the

bathroom. Skinner noticed that Defendant and Stokley had both stepped out of the

Trailblazer. Skinner had not fully exited the Trailblazer to use the bathroom when

she heard three gun shots ring out. Reid heard gun shots, “a thump,” and Stokley’s

scream.

 Defendant stepped back into the Trailblazer, and sat behind Skinner in the

back, driver-side seat. Defendant pressed a gun into Skinner’s side and demanded

that she follow his directions. Stokley did not return to the Trailblazer. Defendant

instructed Skinner to drive around for a while, and then said to Skinner and Reid,

“Instead of one body it will be three.”

 Defendant instructed Skinner to drive past the area where Stokley’s body lay,

and then demanded that Skinner drive Defendant back to his home. Skinner

complied, drove Defendant back to his property, and watched Defendant remove his

Army fatigue jacket and walk off into the darkness. Skinner and Reid left

Defendant’s property and returned to Skinner’s apartment; neither woman contacted

law enforcement.

 Just before midnight, Andrea Smith Jones spotted something in the middle of

the road, and noticed a pair of shoes sticking out from underneath it. Jones then

realized that it was a body lying in the middle of the road. When she arrived home,

 -3-
 STATE V. GRIFFIN

 Opinion of the Court

Jones grabbed her husband and the two of them drove back to the scene. When her

husband realized that the body was that of a dead human, he called 911.

 First responders from the Newland Fire Department and Pasquotank County

Sheriff’s Office arrived at the scene and found Stokley’s body. Upon inspection, the

first responders determined that Stokley was unresponsive and had no pulse. Crime

scene investigators recovered five cartridge casings from the area around Stokley’s

body and collected two bullets from Stokley’s hair and body.

 While the responding officers were still on the scene, dispatch informed them

that a suspicious vehicle had been seen leaving the area. Sergeant Steven Judd left

the scene and drove around for a short period of time, but did not see a vehicle. As

he returned to the scene, Judd watched a vehicle stop at a stop sign on Campground

Road and then pull out in front of him; Judd ran the vehicle’s tag, which came back

as registered to Skinner. Judd did not initiate a traffic stop of Skinner’s vehicle, but

instead returned to the crime scene.

 Around 4 January 2017, Skinner and Reid were contacted by the sheriff’s

office. Detectives separately interviewed Skinner and Reid, both of whom provided

details of the incident during the interview and testified to those details at trial.

Based on what detectives learned from Skinner and Reid, the sheriff’s office obtained

a search warrant for Defendant’s home and property on Campground Road. On 5

January 2017, officers executed the search warrant and found a camouflage jacket in

 -4-
 STATE V. GRIFFIN

 Opinion of the Court

a field on the adjacent property; the jacket was wrapped around a firearm and covered

with field brush. At trial, Skinner and Reid both identified the camouflage jacket as

belonging to Defendant, and Skinner stated that Defendant “had it on the night of

the shooting.” Investigators sent the firearm, bullets, and cartridge casings to the

North Carolina State Crime Lab (the “Crime Lab”) to be analyzed.

 Elizabeth Fields, an agent in the Firearms Unit at the Crime Lab, was

accepted at trial without objection as an expert in forensic firearms examinations and

analysis. She testified that based upon her examination of the firearm recovered

from the field adjacent to Defendant’s property and the cartridge casings recovered

from the crime scene, it was her opinion that the cartridge casings came from the

recovered firearm.

 III. Discussion

 Defendant’s sole argument on appeal is that the trial court erred by admitting

Fields’ expert opinion testimony that the cartridge casings found at the crime scene

came from the firearm recovered from the field adjacent to Defendant’s property.

Defendant specifically argues that Fields’ testimony did not satisfy the reliability

standards for expert opinion under Rule of Evidence 702, Daubert, and McGrady.1

 Defendant acknowledges his failure to object at trial to the admission of Fields’

testimony and, pursuant to N.C. R. App. P. 10(a)(4), specifically argues on appeal that

 1 This State has adopted the Daubert standard applicable to expert opinion testimony as
recognized in McGrady.

 -5-
 STATE V. GRIFFIN

 Opinion of the Court

the trial court’s admission of this testimony constitutes plain error. “Under the plain

error rule, defendant must convince this Court not only that there was error, but that

absent the error, the jury probably would have reached a different result.” State v.

Jordan, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993) (citation omitted).

 It is the trial court’s role to decide preliminary questions concerning the

qualifications of experts to testify or the admissibility of expert testimony. N.C. Gen.

Stat. § 8C-1, Rule 104(a) (2018). Rule 702 of the North Carolina Rules of Evidence

governs testimony by experts. Pertinent to Defendant’s argument, Rule 702 provides

as follows:

 (a) If scientific, technical or other specialized knowledge
 will assist the trier of fact to understand the evidence or to
 determine a fact in issue, a witness qualified as an expert
 by knowledge, skill, experience, training, or education, may
 testify thereto in the form of an opinion, or otherwise, if all
 of the following apply:
 (1) The testimony is based upon sufficient facts or
 data.
 (2) The testimony is the product of reliable
 principles and methods.
 (3) The witness has applied the principles and
 methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a) (2018). Prongs (a)(1), (2), and (3) together

constitute the reliability inquiry discussed in Daubert, General Electric Co. v. Joiner,

522 U.S. 136 (1997), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).

McGrady, 368 N.C. at 890, 787 S.E.2d at 9. “The primary focus of the inquiry is on

 -6-
 STATE V. GRIFFIN

 Opinion of the Court

the reliability of the witness’s principles and methodology, not on the conclusions that

they generate[.]” Id. (internal quotation marks and citations omitted).

 In the context of scientific testimony, Daubert articulated
 five factors from a nonexhaustive list that can have a
 bearing on reliability: (1) “whether a theory or technique .
 . . can be (and has been) tested”; (2) “whether the theory or
 technique has been subjected to peer review and
 publication”; (3) the theory or technique’s “known or
 potential rate of error”; (4) “the existence and maintenance
 of standards controlling the technique’s operation”; and (5)
 whether the theory or technique has achieved “general
 acceptance” in its field. Daubert, 509 U.S. at 593-94. When
 a trial court considers testimony based on “technical or
 other specialized knowledge,” N.C. R. Evid. 702(a), it
 should likewise focus on the reliability of that testimony,
 Kumho, 526 U.S. at 147-49. The trial court should consider
 the factors articulated in Daubert when “they are
 reasonable measures of the reliability of expert testimony.”
 Id. at 152. Those factors are part of a “flexible” inquiry,
 Daubert, 509 U.S. at 594, so they do not form “a definitive
 checklist or test,” id. at 593. And the trial court is free to
 consider other factors that may help assess reliability given
 “the nature of the issue, the expert’s particular expertise,
 and the subject of his testimony.” Kumho, 526 U.S. at 150.

McGrady, 368 N.C. at 890-91, 787 S.E.2d at 9-10.

 Trial courts are “afforded wide latitude of discretion when making a

determination about the admissibility of expert testimony” under Rule 702. State v.

Bullard, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984). Accordingly, “a trial court’s

ruling on the admissibility of expert testimony ‘will not be reversed on appeal absent

a showing of abuse of discretion.’” State v. Godwin, 369 N.C. 604, 610-11, 800 S.E.2d

 -7-
 STATE V. GRIFFIN

 Opinion of the Court

47, 51 (2017) (quoting McGrady, 368 N.C. at 893, 787 S.E.2d at 11) (other citations

omitted).

 The entirety of Defendant’s substantive argument on appeal is as follows:

 In the present case, Fields testified to her opinion
 that the items recovered from the crime scene were fired
 from the gun recovered from the property adjacent to
 [Defendant’s] home. The State’s evidence, however, does
 not establish that “(1) the testimony is based upon
 sufficient facts or data, (2) the testimony is the product of
 reliable principles and methods, and (3) the witness has
 applied the principles and methods reliably to the facts of
 the case.” [McGrady, 368 N.C. at 885, 787 S.E.2d at 6].
 She did testify to her training in firearms identification.
 Nevertheless, her testimony did not establish that she
 satisfied the requisite prongs for such expert testimony.
 When asked about the processes she applied, Fields
 said when she is assigned a case, she checks the firearm to
 be sure it’s safe and functional. This evidence does not
 establish that she uses expert knowledge. More
 importantly, it does not establish that she applied reliable
 principles and methods to the testing in this case. She then
 testified that she fired from the gun into a water tank and
 compared those projectiles with the ones recovered from
 the scene. Her testimony did not establish that she’d
 satisfied Daubert’s three prongs.
 . . . . The testimony was insufficient to show that
 Fields used reliable principles and methods and applied
 them to the materials here as required by McGrady and
 Daubert. She testified in a summary fashion without
 establishing the scientific community’s recognition of the
 standards applied. Although she testified to her education
 and training, being well-trained or educated does not alone
 satisfy the requirements for expert testimony. Therefore,
 the testimony here was inadmissible, and the trial court
 erred by admitting it.

 -8-
 STATE V. GRIFFIN

 Opinion of the Court

 Defendant severely misrepresents Fields’ opinion testimony by briefly

summarizing a few lines of testimony while omitting the bulk of the testimony, and

bases his argument on the unsupported and conclusory allegation that the testimony

was insufficient to satisfy Daubert. Our review of the transcript reveals that Fields’

opinion testimony was sufficient to demonstrate the reliability of the principles and

methodology she used, Joiner, 522 U.S. at 146, and to satisfy the three prongs of the

reliability inquiry. McGrady, 368 N.C. at 890, 787 S.E.2d at 9.

 Fields was accepted by the court, without objection, as an expert in the field of

forensic firearms examination based on the following testimony:

 [Fields]: I received my Bachelor of Science Degree in
 biochemistry, cellular and molecular biology from the
 University of Tennessee. I received my Master of Science
 Degree in forensic science from the University of New
 Haven. While completing my Master’s I completed a course
 in firearm evidence analysis, which covered topics
 including firearm function, ammunition function, and the
 relation between firearms and ammunition. I then
 completed in-house training program with the North
 Carolina State Crime Laboratory. And I completed this in
 two phases. The first phase covered history of firearms,
 safety, ammunition, class characteristics, serial number
 restoration and microscopy. Those allow me to testify in
 cases involving firearm function, caliber determination,
 and serial number restoration. I then completed a second
 phase of training which covered manufacturing and
 individual characteristics, as well as presentation of
 evidence. I then completed that training in July of 2017,
 and that allowed me to complete cases involving forensic
 firearm identification.

 ....

 -9-
 STATE V. GRIFFIN

 Opinion of the Court

[State]: [Did] you have the opportunity to actually conduct
examinations of firearms and ballistics?

[Fields]: Yes, it was part of my training to do practical
exercises.

[State]: Did they test you to see if you were proficient at
identifying whether a particular bullet or a cartridge was
fired from a particular gun?

[Fields]: Yes.

[State]: Did you have to pass that in order to qualify to do
this job?

[Fields]: Yes.

[State]: Was this a practical exam or how did it work?

[Fields]: There was practical exams at the end of every
module within the unit. And at the end each phase they
had a mock case that I completed, which included a whole
trial process, mock trial.

[State]: During your career at the North Carolina Crime
Lab, how many examinations of firearms, shell casings and
cartridges do you believe you performed?

[Fields]: Thousands.

[State]: And with each one of those cases do you generate
a report?

[Fields]: Yes.

[State]: And for each one of those cases what is the policy
of the lab as far as any type of peer review?

 - 10 -
 STATE V. GRIFFIN

 Opinion of the Court

 [Fields]: All of our cases go-- undergo a hundred percent
 review.

 [State]: What does that mean?

 [Fields]: It means each examination I do, once I reach my
 conclusion, another examiner will then examine the same
 evidence and reach a conclusion to make sure that both of
 our conclusions are the same.

 ....

 [State]: So is their review independent?

 [Fields]: Yes. They will have my notes when they do it but
 they will examine the evidence on their own.

 [State]: So have you ever testified in court before?

 [Fields]: Yes.

 ....

 [State]: And were you qualified as an expert in firearms
 examination?

 [Fields]: Yes.

 When asked by the State what makes firearms identification possible, Fields

testified:

 [A]ll firearms are unique during the manufacturing
 process. The tools used to create the firearms will have
 random imperfections and irregularities that will then
 transfer these unique characteristics to the surface of the
 firearm. It’s much like when you use sandpaper, it will
 change with each use so each firearm will be slightly
 different in the individual markings that are left on it. And
 then during the firing process these marks are then
 transferred from the surface of the firearm to the surface

 - 11 -
 STATE V. GRIFFIN

 Opinion of the Court

 of the ammunition components . . . . Once I receive
 evidence I can view these individual things under a
 comparison microscope.

 Fields next explained the procedures and methods she used when analyzing

the bullets in the instant case:

 [Fields]: When I first receive the firearm I will first make
 sure that it’s safe and unloaded and then I will begin a
 function test.
 [State]: And what is a function test?
 [Fields]: So a function test involves making sure the
 firearm functions as it’s intended. I will check to make sure
 that there are (sic) no external damage to the firearm, that
 all safeties that are present are working correctly. I will
 check for internal damage. I will check the magazine
 capacity cycling capabilities and create test fires.
 ....
 [Fields]: Once I checked that the firearm was safe to fire,
 I selected ammunition components that were similar to
 those submitted for comparison and then I created the test
 fires by firing into a water tank.
 [State]: Why did you fire into a water tank?
 [Fields]: When we need to keep the bullets, firing into a
 water tank prevents the bullets from being damaged in any
 way.
 ....
 [State]: So after you do a function test on a weapon like K-
 1 there, what is your next step in the examination?
 [Fields]: After the function test and the test fires are
 created I will then compare the test fire on the microscope
 to ensure that the details from the firearm are replicating
 well. And if I’m able to identify the test fires to each other
 then I will move on to comparing any questioned evidence
 that I have.

 - 12 -
 STATE V. GRIFFIN

 Opinion of the Court

[State]: How many times did you fire that particular
firearm for test firing?
[Fields]: I believe it was three times. Six times. I created
six test fires.
[State]: And you described firing into water, is that
correct?
[Fields]: Yes.
....
[State]: And so what is the purpose of you actually doing
these test fires and producing these bullets?
[Fields]: Producing the test fires will confirm that the
firearm is functioning properly. And also it will allow items
to be created to be compared to any evidence item
submitted.
....
[Fields]: I examined [the bullet] for any class
characteristics. When I first received the item I labeled the
packaging and removed the item and cleaned it of any-- if
there is any materials on it and then I weighed it,
measured it, diameter and engraved it with case number
and my initials.

[State]: When you talk about class characteristics, can you
explain to the jury what you are referring to there?

[Fields]: The class characteristics are one of the two
characteristics we observe in our examination. Class
characteristics are a more broad group. They’re an
indicated restrictive group source and they are determined
prior to manufacturing.

[State]: So give me an example of what a class
characteristic will be?

[Fields]: With bullets, a class characteristic will be caliber,
direction of twist or number of lands and grooves.
....

 - 13 -
 STATE V. GRIFFIN

 Opinion of the Court

[Fields]: Lands and grooves are what make up the rifling
and therefore the direction of twist within the barrel of the
firearm and they are just raising the lowered portions that
are cut into the barrel that will impart the spin on the
bullet.
....

[Fields]: I determined the caliber to be caliber 38 class,
nine millimeter. Also determined there to be six land and
groove impressions and a right direction of twist.

[State]: And is that under a microscopic exam?

[Fields]: The direction of twist can be determined visually.
The lands and grooves are generally used under a
stereoscope and the caliber is determined through a
combination of the weight and diameter and design.

[State]: So after you did that portion of the examination,
what did you do?

[Fields]: After I completed that portion I then began my
comparison to the test items I created.

....

[Fields]: So when I examine the test fires I will determine
which was producing the characteristics the best
compared to the characteristics that I might be looking for
on the questioned item. Then I would try to locate an
alignment between the test item and the questioned item
and alignment meaning the lands and grooves would be
like in phases rotating together. In this case I focused on
T-4 to the T-6 test fires. The T-1 through T-3 had some
slippage which means the land and grooves did not engage
properly with the bullets when they were fired. So I use a
different material to create the next three test fires. I
examined the bullet facing to the left and right to
determine-- see if the individual characteristics were better

 - 14 -
 STATE V. GRIFFIN

 Opinion of the Court

 viewed with the lighting from one way or another. And I
 compared like T-4, 5 and 6 all to Q-6.
 ....

 Fields next explained the procedures and methods she used when analyzing

the cartridge casings in the instant case:

 Q. How do you do [examine cartridge casings]?

 A. It’s similar to the way that I would examine the fired
 bullets. I will examine the cartridge case for class
 characteristics, usually the caliber stands on the head
 stamp which is the face of [. . .] where the primer is located.
 And its class characteristics will be based on the detail left
 on its breech face.
 ....

 [State]: So, ma’am, please explain the process with these
 shell casings, cartridge casings, on how you did your
 comparison between your test fires versus the items sent
 to you by the Sheriff’s Department?
 [Fields]: The same way that I examined the test fires to
 each other just like with the bullets. I first check to be sure
 the details were producing from the firearm and once I
 determine that they were, I then compared the questioned
 items to the test fires on the comparison microscope.
 [State]: Did you do that for each of the five shell casings
 that the Sheriff’s Department sent you?
 [Fields]: Yes.
 [State]: And what did you learn based on your
 examination?
 [Fields]: Q-1, 2, 3, 4, and 5 cartridge casings were fired in
 the K-1 pistol.
 [State]: Make sure I understand that correctly. You’re
 saying that those shell casings came out of that gun, they
 were fired from that gun?
 [Fields]: Yes.

 - 15 -
 STATE V. GRIFFIN

 Opinion of the Court

 [State]: And did you prepare a report regarding your
 findings in this case?
 [Fields]: Yes.

 Fields’ opinion testimony shows that: (1) she was formally educated and

trained in forensic science and in the field of firearms examination; (2) she tested and

analyzed the firearm, bullets, and cartridge casings in keeping with the procedures

and methods learned during her specialized training in firearms examination; (3) her

tests generated data, which she analyzed and used to form an opinion on whether or

not the bullets and casings came from the recovered firearm; and (4) the data and

conclusion were described in a written report and subsequently peer-reviewed by one

of Fields’ colleagues in the Firearms Unit. The trial court has the discretion to “use

those factors that it believes will best help it determine whether the testimony is

reliable,” McGrady, 368 N.C. at 890, 787 S.E.2d at 9, and these factors support a

determination that Fields’ opinion testimony was reliable.

 During cross-examination, Defendant’s counsel asked Fields about the

national standards set forth by the Association of Firearm and Tool Mark Examiners

(“AFTE”). Fields explained that she and her peers at the Crime Lab all use the same

national standard when completing their work, and that the standard comes from the

AFTE. Fields explained that, for firearms examinations in general, there is an

accepted error rate of one percent, and that she does not yet have an error rate

because, based on her proficiency test and her examinations that are reviewed by

 - 16 -
 STATE V. GRIFFIN

 Opinion of the Court

another examiner, she has not yet made an error. Fields then testified about various

reports and studies conducted on the field of firearms analysis. We note that

“[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of

attacking . . . admissible evidence.” Daubert, 509 U.S. at 596. “These conventional

devices, rather than wholesale exclusion . . . are the appropriate safeguards where

the basis of scientific testimony meets the standards of Rule 702.” Id.

 As Fields’ testimony shows that her opinion was the product of reliable

principles and methods, and that she reliably applied the principles and methods to

the facts of the case, we conclude that the trial court did not abuse its discretion,

much less plainly err, in admitting Fields’ expert opinion testimony on forensic

firearms examination. See Godwin, 369 N.C. at 611, 800 S.E.2d at 51.

 IV. Conclusion

 For the reasons stated herein, we hold that the trial court did not err by

admitting Fields’ expert opinion testimony. Defendant received a fair trial, free of

error.

 NO ERROR.

 Judges DIETZ and MURPHY concur.

 - 17 -