IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-1149

Filed: 31 December 2020

Sampson County, No. 17 CRS 52461

STATE OF NORTH CAROLINA

v.

BENNY RAY ROBINSON

Appeal by defendant from judgment entered 6 June 2019 by Judge Charles H. Henry in Superior Court, Sampson County. Heard in the Court of Appeals 11 August 2020.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Tamika L. Henderson, for the State.*

*Mark Montgomery, for defendant-appellant.*

STROUD, Judge.

Defendant Benny Ray Robinson appeals from his convictions for first degree rape, first degree sexual offense, and taking indecent liberties with a child. He also challenges a civil order requiring him to enroll in lifetime satellite-based monitoring ("SBM"). Defendant argues the trial court committed plain error by allowing an expert witness to vouch for truthfulness by using the word "disclosure" during her testimony. Defendant failed to show that the use of the term "disclosure" by the expert witness was plain error. However, we agree with Defendant that the SBM

order is unconstitutional, and we reverse the order imposing lifetime SBM to begin at least 20 years after release from imprisonment.

## I.     Background

At trial, the State's evidence tended to show that in 2007 and 2008 Defendant sexually assaulted Katy[1] while she was in first grade.  Defendant was the cousin of Katy's mother's girlfriend, and Defendant would do drugs with Mother and her girlfriend.  Katy testified that her mother would often leave the house and Defendant was alone with Katy and her brothers.  Katy testified on one occasion that she was asleep on the couch and Defendant put his penis in her vagina. Katy also testified that on another occasion while her mother was not home, Defendant brought a pie to their house before pulling her pants down and inserting a finger in her vagina.  Katy told no one about what happened until June 2017, when she was asked if she had ever been raped during the intake process for juvenile detention.  The allegation of rape was reported to the New Hanover County DSS office, and Katy was referred to the Child Advocacy Center where she underwent a forensic interview.

Defendant was charged with first degree rape of a child, first degree sex offense with a child, and taking indecent liberties with a child.  Following a jury trial in Superior Court, Sampson County, Defendant was found guilty of all three charges. Defendant was sentenced to 240 months minimum and 297 months maximum.

---

[1] A pseudonym is used to protect the identity of the juvenile and for ease of reading.

Following his trial, Defendant gave notice of appeal in open court, and then a *Grady* Hearing was held to determine the reasonableness of SBM. The trial court found Defendant committed "an offense against a minor under G.S. 14-208.6(1m)," "rape of a child G.S. 14-27.23, or sexual offense with a child, G.S. 14-27.28," "has not been classified as a sexually violent predator under the procedure set out in G.S. 14.208.20," "is not a recidivist," "is an aggravated offense," and "did involve the physical, mental, or sexual abuse of a minor." Upon his release from imprisonment, Defendant was ordered to register as a sex offender for life and to enroll in SBM for life.

## II. "Disclosure" and Vouching

Defendant argues the trial court committed plain error by allowing the State's expert witness to describe Katy's claim she was raped as a "disclosure." He contends "[w]ithout the vouching the jury would probably have doubted her." We disagree.

Because Defendant did not object to the use of the word "disclosure" at trial, we review this issue for plain error. N.C. R. App. P. 10(a)(4). Plain error arises when the error is "so basic, so prejudicial, so lacking in its elements that justice cannot have been done[.]" *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citation omitted). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

Our Supreme Court has held,

> In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has *in fact* occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility. However, an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith.

*State v. Stancil*, 355 N.C. 266, 266-67, 559 S.E.2d 788, 789 (2002) (citations omitted).

"[E]xpert witnesses may not vouch for the credibility of victims in child sex abuse cases when there is no evidence of physical abuse. Our Supreme Court 'has found reversible error when experts have testified that the victim was believable, had no record of lying, and had never been untruthful.'" *State v. Betts*, 267 N.C. App. 272, 280, 833 S.E.2d 41, 46 (2019) (citation omitted) (quoting *State v. Aguallo*, 322 N.C. 818, 822, 370 S.E.2d 676, 678 (1988)). We review on a fact-specific basis whether expert testimony amounted to improper vouching for a witness. *See State v. Chandler*, 364 N.C. 313, 318-19, 697 S.E.2d 327, 331 (2010) ("Whether sufficient evidence supports expert testimony pertaining to sexual abuse is a highly fact-specific inquiry. Different fact patterns may yield different results. . . . Before expert testimony may be admitted, an adequate foundation must be laid." (citations omitted)).

Defendant argues the dictionary definition of the word "disclose" is "to make known (as information previously kept secret)," and the General Assembly has used

the word "disclose" in various statutes with the same meaning: "*See, e.g.,* N.C. Gen. Stat. §. 14-190.5A ('Disclosure of Private Images'); N.C. Gen. Stat. §. 15A-904 ('Disclosure by the State Certain Information Not Subject to Disclosure'); N.C. Gen. Stat. .§ 20-7l.4 ('Failure to Disclose damage to a vehicle shall be a misdemeanor.')[.]" Defendant is correct that the word "disclose" may have the connotation of exposing previously hidden but truthful information, but we must consider the use of the word in this particular case in context. When we consider the testimony of Shannon Barber, the director of the Sampson County Child Advocacy Center, and the use of the word "disclose" by counsel and Ms. Barber, it simply does not have the connotation of exposing a previously hidden truth as argued by Defendant.

Previous cases have considered the use of the word in the context of the evidence in the particular case, and the published case Defendant cites to support his position is not analogous to this case. In *State v. Crabtree* the expert witness expressed an opinion on whether sexual abuse occurred. 249 N.C. App. 395, 402-03, 790 S.E.2d 709, 715 (2016), *aff'd*, 370 N.C. 156, 804 S.E.2d 183 (2017) ("In contrast, St. Claire's testimony did include impermissible vouching. We find no fault with St. Claire's description of the five-tier rating system that the clinic uses to evaluate potential child sexual abuse victims based on the particularity and detail with which a patient gives his or her account of the alleged abuse. However, her statement that '[w]e have sort of five categories all the way from, you know, we're really sure [sexual

- 5 -

abuse] didn't happen to yes, we're really sure that [sexual abuse] happened' and her reference to the latter category as 'clear disclosure' or 'clear indication' of abuse, in conjunction with her identification of that category as the one assigned to L.R.'s 23 December 2013 interview, crosses the line from a general description of the abuse investigation process into impermissible vouching. Likewise, St. Claire's testimony that her team's 'final conclusion [was] that [L.R.] had given a very clear disclosure of what had happened to her and who had done this to her' was an inadmissible comment on L.R.'s credibility." (alterations in original)). There is no per se rule that using the word disclosure is vouching. *See Betts*, 267 N.C. App. at 281, 833 S.E.2d at 47 ("There is nothing about use of the term 'disclose', standing alone, that conveys believability or credibility.").

Here, Ms. Barber performed a forensic interview on Katy and testified about Katy's interview. Her first use of the word "disclosure" was as part of the *title* of the forensic interview technique she had used:

> Q. And what is a forensic interview?
>
> A. A forensic interview is a research-based, best practice model that is recognized nationally. We call it the RADAR method. It is recognized nationally as a way to interview children that have alleged abuse.
>
> Q. And what is the RADAR method?
>
> A. RADAR stands for Recognizing Abuse Disclosure types and Responding. And there are several steps to that method.

This use of the word "disclosure" was simply as part of the description of the interview method and was not "vouching" for the truth of what an alleged victim reveals.

In her testimony regarding the details of the sexual abuse, Ms. Barber used the word "disclosed" only once, when referring to when Katy reported the abuse to the detention center:

> Q. What, specifically, did [Katy] tell you happened to her?
>
> A. [Katy] talked about that she was here at the Child Advocacy Center that day to talk about something that happened to her when she was younger. She said that she *disclosed* this when she was in Wilmington, and they -- at the detention center, and they asked her if she had been raped. She said she told them there that she had, but she did not give them details.
>
> She's told me she had never told her parents, they did not even know why she was at the Center that day. She still had not told them. She states that she was living with her mom, and mom was doing drugs, and that mom's friend, Benny, raped her. She told me that she was asleep on the couch and that when mom does drugs, that she would – she would always sleep on the couch and they would do drugs in the bedroom. She said that mom left, but she doesn't know where she went. She said that she woke up to Benny pulling her underwear down and whispering to her not to tell anyone.
>
> She reports that he fondled her vagina with his hand on the outside of her vagina only. She reports that he stuck his penis inside of her vagina and was moving. She said that he did not wear a condom, and she does not remember if anything came out of his penis. She did not know how long it lasted. She said she was crying and telling him to stop. She said he eventually stopped because she started crying louder. She states that she was wearing one of mom's shirts when this happened. She said that she went

in to tell her mom the next morning what happened but the suspect was in mom's room with her, so she decided not to tell.

Then she said there was another incident that occurred approximately two weeks after the first incident. She said that the suspect came over and brought a piece – or brought pecan pie. She said her brother, Quan, was in the bedroom playing his video game. She states that she was in the kitchen, suspect carried her to the back door, and fondled her vagina again. He did insert his finger inside of her vagina on this occasion.

She states her mom was not home. She was wearing pants and a shirt when this happened. Both of these incidents occurred when she was living at Indian Town Road in Clinton with mom. She did not remember exactly how old she was, but states that she was going to L. C. Kerr at the time of the incidents.

She reports that school was in, but it was warm outside when this happened. She never told anyone what had happened because she felt like she would be judged. She said she did end up telling Lexi Lee who lives behind dad in Garland when she was 14 years old. She never told anyone else about the incident.

She told me the suspect works at the gas station across from KFC in Clinton and that she still sees him occasionally but tries to ignore and avoid him. She denies anyone else ever doing anything like this to her. There was no other information gathered.

(Emphasis added.)

In her testimony on direct examination, Ms. Barber primarily used verbs other than "disclose" to refer to Katy's statements about the alleged sexual abuse, such as "reports," "states," "said," "shared" or "told." The words "disclosed" or "disclosure" were used primarily during cross examination, mostly in questions by Defendant's counsel or by Ms. Barber as a reference to the information Katy provided in her

interview with Ms. Barber. The word "disclosure" or some variant (disclosed, disclose) was used far more in counsel's questions, both by the State and for Defendant, in questioning Ms. Barber than in her answers. The word appears only twice during Ms. Barber's testimony on direct examination by the State.

Counsel for both the State and Defendant, as well as Ms. Barber, used the word "disclosure" (or some variant of "disclose") primarily as a short-hand way of referring to the information Katy had provided to Ms. Barber during her forensic interview when she reported the allegations of abuse. For example, on cross-examination, Defendant's counsel questioned Ms. Barber regarding the absence of various factual details in the forensic interview, such as the layout of the home or other people who may have been present during the alleged abuse:

> Q. Okay. And was she giving you specific details about the incident?
>
> A. *What she disclosed whenever I interviewed her that was played earlier are the things that she said, the details that she gave.*
>
> Q. What were the details?
>
> A. That he pulled her -- she woke up, he was pulling her pants down, he whispered in her ear not to tell anyone, he touched her vagina with his hand, he stuck his penis inside of her vagina, and was moving.
>
> Q. And did she give you any details about where she lived?
>
> A. She said she lived on Indian Town Road.

Q. No. Did she give you any details about her environment, her home?

A. She just told me she lived on Indian Town Road.

Q. Did she give you any information that she lived in a trailer?

A. No, sir. She only referenced living at that location.

Q. Oh, okay. She didn't tell you anything about the fact that the trailer had two bedrooms, a living room, a kitchen? She never mentioned any of that?

A. I didn't ask her what type of home it was. She didn't share that information.

Q. Might it not have some relevance?

A. It did not that day. My job was to get her account of what happened.

Q. You [sic] job was to get her to tell about the alleged sexual incident?

A. Right. My job was to get her side of story.

Q. Okay. Her side of story but, nevertheless, wouldn't the environment of the alleged victim have at least some moderate connection to what they were telling you?

A. It did not to me that day. She told me she was on the couch in the living room and that mom –

. . . .

Q. Okay. So if the environment was in a trailer with two bedrooms, a living room, a kitchen, reasonable minds could say that was a small area, wouldn't we?

A. I'm assuming so.

Q. Okay. And so if one, in a small area was to encounter this type of situation, might not it be relevant to the story they're telling you if they said that it happened, they cried, and they cried louder, and they were in an environment that involved two bedrooms, a living room, and a kitchen, in a trailer, might not it be relevant as to the plausibility and the reliability of the information you're getting the sort of physical environment where this took place?

*A. I didn't think so because she said there was no one else home.*

*Q. That's what she told you?*

*A. She did not disclose anyone else being there.*

Q. Have you been here the whole while?

. . . .

A . I have.

Q. You didn't hear her testify that usually her three brothers were there with her?

A. I did hear her say that, but *I'm testifying on her forensic interview, not what she said today.*

Q. Okay. But you did hear her say that her three brothers were there?

A. I heard her say that her three brothers are normally home.

Q. Okay. And so wouldn't that have some relevance as to whether or not what she was telling you might have a twinge of truth to it?

A. On that day, she did not share information that her brothers were in the home.

Q. On that day, she did not share information that her brothers were home, correct?

A. Yes.

Q. My question to you was: As a person with a Bachelor's degree in psychology, don't you think that might have had some relevance to the story being told that there were three other people in the house, in the trailer?

A. *The only time she disclosed someone being home was the second incident. She did not disclose there were people in the home the first incident.*

Q. *Okay. Third and final try, she did not disclose that there were others at home?* She did not tell you about the others being home, understood. I'll ask and try to articulate the question. Do you think, based on your experience and knowledge about recognizing what children are telling you, that there might have been some connection between there being three other people in the house at the time this allegedly took place?

A. No.

Q. Do you understand my question?

A. She said there was no one else in the home.

Q. I understand that.

A. So I didn't ask her any questions about the layout of the home in the event someone may have heard her.

Q. I am – that's not the question I'm asking. I'm just asking for a simple – I'm asking your opinion, based on your experience and knowledge, the fact that there may

have been three other people in the house at the time. Wouldn't that be relevant to the story?

A. It was not relevant that day. No.

Q. In your opinion?

A. No, it was not.

Q. Okay. Why not?

A. Because she did not disclose there being people in the home.

MR. HEIGHT: Well isn't it possible that if there were three other people in the house and she was crying out that they would have heard her?

. . . .

THE WITNESS: Absolutely, if there were people in the home.

Q. All right. I'll move on. And you went on to testify that she did not disclose this information, according to her statements to you, is because of what?

A. She – I'll go back and see what she said. Seems like she said that she was afraid of being judged. She reports she did not tell anyone what had happened because she felt like she would be judged.

(Emphases added.)

Defendant's counsel also asked Ms. Barber about her opinion on Katy's truthfulness, and she testified that she was not stating any opinion as to whether Katy was telling the truth:

Q. And in your questions that you asked, are there certain questions that give you a perspective which allows you to determine the truth or veracity of the information that you're being given?

A. My job is not to determine if she's telling the truth or telling a lie. My job is strictly to get information from her and make sure she's okay.

Thus, in context, the use of the word "disclosure" or a variant did not carry a suggestion of any opinion as to the truth of what Katy had stated regarding the sexual abuse. In addition, the word "disclosure" was used primary by counsel in questioning and not as part of Ms. Barber's substantive testimony regarding what Katy had reported. In this context, she did not vouch for Katy's truthfulness. This argument is overruled.

### III.    Petition for Writ of Certiorari and Rule 2

The transcript shows that Defendant's counsel gave notice of appeal before the trial court started the *Grady* Hearing, and did not object on constitutional grounds nor give notice of appeal from the civil SBM order. Because Defendant did not object to the imposition of lifetime SBM on constitutional grounds, he has waived the ability to argue it on appeal. *State v. Bursell*, 372 N.C. 196, 199-200, 827 S.E.2d 302, 305 (2019); N.C. R. App. P. 10(a)(1).

"To prevent manifest injustice to a party" this Court may "suspend or vary the requirements or provisions of any of these rules in a case pending before it upon application of a party or upon its own initiative[.]" N.C. R. App. P. 2. "A court should

consider whether invoking Rule 2 is appropriate 'in light of the specific circumstances of individual cases and parties, such as whether "substantial rights of an appellant are affected."'" *Bursell,* 372 N.C. at 200, 827 S.E.2d at 305-06 (quoting *State v. Campbell,* 369 N.C. 599, 603, 799 S.E.2d 600, 602 (2017)). This Court has previously held that

> [a]n order requiring a defendant to participate in the State's lifetime SBM program per N.C. Gen. Stat. § 14-208.40A(c) (2019) effects a search triggering the Fourth Amendment's protection from unreasonable searches and seizures. *Grady v. North Carolina,* 575 U.S. at 308-309, 135 S.Ct. 1368, 191 L. Ed. 2d at 461. This is a substantial right that warrants our discretionary invocation of Rule 2.

*State v. Graham*, ___ N.C. App. ___, 841 S.E.2d 754, 769, *review allowed in part, denied in part*, 375 N.C. 272, 845 S.E.2d 789 (2020).

Here, we conclude that based on the circumstances of this case a substantial right of Defendant's is affected. In our discretion, we invoke Rule 2 to prevent a manifest injustice and grant Defendant's petition to review the constitutionality of his SBM order. *See* N.C. R. App. R. 21.

## IV.    SBM

Defendant argues, "the trial court erred by ordering lifetime SBM in the absence of any evidence from the state that lifetime SBM was a reasonable Fourth Amendment Search of [Defendant]." (Original in all caps.) "We review a trial court's

determination that SBM is reasonable *de novo.*" *State v. Gambrell*, 265 N.C. App. 641, 642, 828 S.E.2d 749, 750 (2019).

Although the holding of *State v. Grady*, 372 N.C. 509, 831 S.E.2d 542 (2019) ("*Grady III*"), does not directly apply to Defendant in this case, who was not classified as a "recidivist," the analysis of the issue described in *Grady III* does apply to this case.[2] *See State v. Griffin*, ___ N.C. App. ___, ___, 840 S.E.2d 267, 273 (2020) ("Although *Grady III* does not compel the result we must reach in this case, its reasonableness analysis does provide us with a roadmap to get there. As conceded by the State at oral argument, *Grady III* offers guidance as to what factors to consider in determining whether SBM is reasonable under the totality of the circumstances. We thus resolve this appeal by reviewing Defendant's privacy interests and the nature of SBM's intrusion into them before balancing those factors against the State's interests in monitoring Defendant and the effectiveness of SBM in addressing those concerns. (citing *Grady III*, 372 N.C. at 527, 534, 538, 831 S.E.2d at 557, 561, 564.")).

Here, following Defendant's trial, the State acknowledged the need to have a Grady Hearing to determine the reasonableness of SBM. The State presented no

---

[2] "[F]ollowing the Supreme Court's orders temporarily staying this Court's decisions in both *Griffin* and *Gordon*, the precedential value of those decisions is in limbo. While they are not controlling, neither have they been overturned. They are instructive as the most recent published decisions of this Court addressing *Grady III's* application outside the recidivist context[.]" *State v. Hutchens*, ___ N.C. App. ___, ___, 846 S.E.2d 306, 311 (2020).

additional evidence to support the reasonableness of SBM and made the following

argument:

> As the Court's aware, the monitoring does not prohibit him from traveling, working, or otherwise enjoying the ability to move about as he wishes. And this would, of course, be effective once he's released from the Department of Corrections. Instead, it just records where he's traveling to ensure he's complying with the terms of his probation, if any, and the state laws. Of course, there's a strong public interest in the benefit of monitoring those convicted of sex offenses and it would outweigh any minimal impact on his privacy interest.
>
> Of course, the only expectation of privacy the law requires the Court to honor is the one that society is required to recognize is reasonable. His address and record would be made public record. The monitor would not reveal his activities, just his location, and the fact it could also be used alternatively to either implicate or exonerate him in a subsequent crime.
>
> Similar searches in the form of hidden cameras and traffic lights and undercover officers in drug areas have been found to be reasonable. Ultimately, I would ask the Court to conclude that any infringement on his right to privacy is slight, and the value to society for monitoring outweighs that infringement on his right to privacy. I would ask the Court to take judicial notice in that, "The United States Supreme Court has long recognized the dangers of recidivism in cases of sex offenders." That's Smith versus Doe, 538 U.S. 84. In McKune versus Lile, 536 U.S. 24.
>
> "The essence of the satellite-based monitoring system is generally accepted by the Courts." And that's Doe versus Dresden, 507 F.3d. 998.
>
> "It is within the purview of the state government to recognize and to reasonably react to a known danger in order to protect its citizens." And that's Samson versus California, 547 U.S. 843.

The trial court ordered Defendant, upon his release from prison, to enroll in SBM "for the rest of his natural life."

We are unable to distinguish the factual situation of this case, where Defendant will not be released from prison for twenty to twenty-four years, from *State v. Gordon,* ___ N.C. App. ___, 840 S.E.2d 907 (2020), where the defendant was not eligible to be released from prison for fifteen to twenty years, and *State v. Strudwick,* ___ N.C. App. ___, ___ S.E.2d. ___ (6 October 2020) (No. COA18-794-2), where the defendant was not a recidivist and was not eligible to be released from prison for thirty to forty-three years.

Here, the State presented *no evidence* showing how *SBM* will *reduce recidivism*.

> [T]he State's ability to demonstrate reasonableness is hampered by a lack of knowledge concerning the unknown future circumstances relevant to that analysis. For instance, we are unable to consider "the extent to which the search intrudes upon reasonable privacy expectations" because the search will not occur until Defendant has served his active sentence. The State makes no attempt to report the level of intrusion as to the information revealed under the satellite-based monitoring program, nor has it established that the nature and extent of the monitoring that is currently administered, and upon which the present order is based, will remain unchanged by the time that Defendant is released from prison.

*Gordon,* ___ at ___, 840 S.E.2d at 912-13 (citation omitted). "Accordingly, we necessarily conclude that the State has failed to meet its burden of establishing that

lifetime satellite-based monitoring following Defendant's eventual release from prison is a reasonable search in Defendant's case. We therefore reverse the trial court's order." *State v. Strudwick*, ___ N.C. App. at ___ S.E.2d. at ___, slip op. at *9 (quoting *State v. Gordon* ___ N.C. App. at ___, 840 S.E.2d at 914). Because we are reversing Defendant's SBM order, we do not reach Defendant's alternative ineffective assistance of counsel claim.

## V.    Conclusion

We find no error in Defendant's trial and conviction but reverse the trial court's order imposing lifetime SBM for Defendant.

NO ERROR IN PART; REVERSED IN PART.

Judges BRYANT and BROOK concur.