IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-215

No. COA20-241

Filed 18 May 2021

Cumberland County, No. 18 CRS 53257

STATE OF NORTH CAROLINA

v.

WILLIE PEARL MACK, JR.

Appeal by Defendant from Judgments and Orders entered 5 August 2019 by Judge Jeffery K. Carpenter in Cumberland County Superior Court. Heard in the Court of Appeals 10 March 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Anne J. Brown, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Wyatt Orsbon, for defendant-appellant.*

HAMPSON, Judge.

## **Factual and Procedural Background**

Willie Pearl Mack, Jr. (Defendant) appeals from Judgments entered upon jury verdicts finding him guilty of Second-Degree Rape (under former N.C. Gen. Stat. § 14-27.3) and Second-Degree Sexual Offense (under former N.C. Gen. Stat. § 14-27.5). Additionally, Defendant seeks a Writ of Certiorari from this Court to review Orders requiring Defendant to register as a sex offender and to enroll in satellite-based

monitoring for the rest of Defendant's life.  The Record, including evidence adduced at trial, tends to reflect the following:

¶ 2    Tamara[1], the alleged victim in this case, moved to Fayetteville, North Carolina from Washington, DC in 2011.  On the night of 2 August 2011, Tamara was in a park in downtown Fayetteville "doing drugs" with "a couple of homeless people[.]"  At some point, Tamara decided to take a walk in order to "score drugs."  Tamara admitted to having traded sexual acts for drugs in her past, but had stopped doing so because she was "deathly afraid" of contracting HIV.  On the night in question, Tamara had her former boyfriend's food stamp card which she planned to use to "swap for some drugs."

¶ 3    Tamara recalled seeing a man "way back" behind her as she walked and that the man was walking "extremely fast."  Tamara noted, "every time I looked back he was just closer and closer.  Like I felt like he was running up on me. . . . I stopped just to let him pass me[.]"  According to Tamara, "[the man] spoke and I spoke back, . . . I remember him telling me I had a pretty smile . . . I don't remember how the drug conversation came up, but he was like yeah, I know somebody."  The man told Tamara, "I can take you to get some, you know, don't worry about it.  Just follow me."  Tamara had followed strangers to find drugs before, and she was willing to "take that

---

[1] We use the parties' stipulated pseudonyms: "Tamara" for the alleged victim in this case; and "Kesha" for another alleged victim of Defendant who testified for the State at trial.

gamble." However, Tamara denied the man ever requested Tamara exchange sex for drugs.

¶ 4        Tamara followed the man, and the two turned down a street Tamara recognized because she "might have been down there to somebody's house" in order to use drugs. Tamara continued to follow the man around a corner to an open area behind a building. When Tamara rounded the corner with the man, the man "turned on me real quick. . . . [H]e grabbed me by my neck. And I'm not going to say he squeezed me - - the life out of me where I couldn't breathe, but he was squeezing pretty hard. I knew what was getting ready to happen." The man told Tamara if she moved or screamed, "he's going to f[---]ing kill me and he asked me was I going to be a good girl." Tamara "never knew what fear was until that day" and that she "couldn't cry." The only thing she could say was "please don't kill me[.]"

¶ 5        Then, the man started "feeling all over" her. At first, Tamara thought the man might be robbing her, but "everything he took out, he put back." The man forced Tamara's head down and made her perform oral sex on him. Then, the man pulled Tamara's pants down, "got behind" her, and "had sex with [Tamara] from behind until he ejaculated." Tamara also recalled the man "kissed me passionately like we was in a relationship" after the rape. Tamara stated the kiss made her sick to her stomach. The man never gave Tamara any drugs and Tamara had never promised to exchange sex for drugs. After the rape, the man ran away. Tamara then ran "over to the Burger

King" nearby where people told her there were police officers present. Tamara did so because she "knew he messed up when he ejaculated in me and it was no way I was going to let that get out of me."

¶ 6        After midnight on 2 August 2011, Officer Zaira Scott, with the Fayetteville Police Department, was at a Burger King restaurant in downtown Fayetteville with Officer Scott's training officer discussing a call to which the two had just responded. As Officer Scott and the training officer were talking, a woman approached the officers' vehicle and told the officers she had just been "sexually assaulted." The woman, Tamara, was "[u]pset," "angry," and "crying[.]" Tamara told Officer Scott that a man had been following her as Tamara walked down Person Street in downtown Fayetteville. Tamara told the officers the man "forced" her to walk behind a building and "choked her by putting his hand around [her] neck." According to Tamara, the man threatened to kill her if she did not do "what he told her to do." Tamara described her assailant as a bald man with "a little thin mustache."

¶ 7        Tamara recounted the assault to the officers stating: "the black male pulled her pants down and penetrated her vagina with his penis." After Tamara recounted the alleged assault to the officers, the officers searched her and "put her in the back of [the] patrol car[.]" The officers found no illegal contraband on Tamara. The officers took Tamara to the alleged crime scene where the officers collected a Pepsi bottle from which Tamara claimed her assailant had been drinking. The officers then took

Tamara to Cape Fear Valley Hospital for "medical assistance," and she "agreed to do [a] sexual assault kit."

¶ 8        After reviewing a report of the incident, Detective John Benazzi, who was at the time with the Fayetteville Police Department's Special Victims Unit, contacted Tamara in order to investigate the alleged rape. According to Detective Benazzi, Tamara "reiterated exactly what she told" the two officers on the night of the incident. Tamara told Detective Benazzi her assailant was a "black male about 40 years old, bald head . . . and a mustache." Detective Benazzi did not find a person matching that description when he searched a nearby bus station. Detective Benazzi assembled a "photo array" of potential suspects based on Tamara's description of her alleged assailant. Tamara "did not make an identification with anybody in that photo lineup." When Detective Benazzi spoke with Tamara after the photo lineup, Tamara "was still very scared" and did not want to stay in Fayetteville any longer. The Fayetteville Police victim advocate obtained a bus ticket for Tamara so she could go to Winston-Salem. Eventually, Fayetteville Police "inactivated" Tamara's case as "there were no further leads to follow up on[.]"

¶ 9        Several years later, in 2015, the Fayetteville Police Department received a federal grant to investigate the Department's "backlog" of untested sexual assault kits. Fayetteville Police sent Tamara's sexual assault kit to the Federal Bureau of Investigation (FBI) for testing in December 2016. The FBI's testing returned a

potential match to a "Willie Mack" already in the national database. Based on this potential match, Detective Benazzi "started trying to reach out to [Tamara]." Detective Benazzi was able to find Tamara when Tamara appeared for a court date in Forsyth County in December 2017. When Detective Benazzi showed Tamara a picture of Defendant, Tamara stated: "Wow. Wow. That's the man who raped me."

¶ 10    Detective Benazzi obtained a search warrant to collect DNA evidence, in the form of buccal swabs, from Defendant. The FBI's comparison of the DNA from Defendant's buccal swabs indicated a match with the male DNA from Tamara's sexual assault kit. Detective Benazzi interviewed Defendant as he was executing the search warrant to obtain Defendant's buccal swabs. During the interview, which Detective Benazzi recorded, Defendant said he was in Oklahoma during 2011.[2]

¶ 11    A Cumberland County Grand Jury Indicted Defendant on charges of Second-Degree Rape, First-Degree Kidnapping, and Second-Degree Sexual Offense involving the alleged victim Tamara on 11 February 2019. The Grand Jury also indicted Defendant for attaining Habitual-Felon-Status. Defendant's case came on for trial in Cumberland County Superior Court on 29 July 2019.

¶ 12    During her trial testimony, Tamara, pointed to Defendant in open court identifying him as her assailant. She described Defendant as a "[b]lack male, bald,

---

[2] The State played the recording of Detective Benazzi's interview with Defendant for the jury during direct examination of Detective Benazzi.

thin mustache." On cross examination, Defendant's counsel asked Tamara: "Now, you were pretty pissed about the situation when there weren't any drugs involved; weren't you?" Tamara responded: "I was pretty pissed at the fact that I thought this was going to be an easy transaction and not a rape."

¶ 13        Jade Gray, a supervisory biologist forensic examiner in the DNA casework unit at the FBI laboratory, testified for the State. After the trial court accepted Gray as a DNA expert, Gray testified her lab received evidence in the State's case against Defendant in December of 2016. Gray's team tested vaginal swabs from Tamara's sexual assault kit, oral swabs from Defendant, and another sample from Tamara. The test of the vaginal swabs revealed "male and female DNA" and the DNA "unlike [Tamara's] was consistent of having arisen from a single male individual[.]" Gray "selected [the male DNA] to be uploaded" into the Combined DNA Index System (CODIS) to see if the male DNA profile matched any profiles already in the database. Gray testified the male DNA tested and uploaded came back as a match in the database to a Willie Pearl Mack. On 29 June 2017, Gray sent a letter to Lieutenant Somerindyke, with the Fayetteville Police Department, informing him that the male DNA returned a CODIS match to a Willie Pearl Mack.

¶ 14        According to Gray, after testing the buccal swabs Detective Benazzi obtained from Defendant, the comparison between the male DNA profile from Tamara's sexual assault kit and the profile from Defendant's buccal swabs revealed that the male DNA

from the sexual assault kit was "660 sextillion times more likely" to have come from Defendant than from another contributor. This likelihood "fell into [Gray's lab's] highest level of support for identification."

¶ 15    Prior to trial, the State had indicated its intent to introduce evidence of Defendant's prior bad acts—including evidence of other rapes committed by Defendant—pursuant to Rule 404(b) of the North Carolina Rules of Evidence. In response, Defendant filed a Motion in Limine seeking exclusion of such evidence. After other witnesses testified, the trial court heard—outside the presence of the jury—both parties on the issue of evidence of Defendant's prior alleged rapes. The State only had witnesses present who could testify about one of the alleged rapes involving a woman named Kesha. The trial court heard voir dire testimony from Kesha about a 2009 encounter with Defendant where Kesha alleged Defendant raped her. Kesha testified she lived in Fayetteville and, on the morning of 29 July 2009, she was supposed to be at court in downtown Fayetteville by 9 a.m. as a witness. Kesha further stated, after she missed the bus she planned to take to court, she tried to find "a ride" to get to court. Kesha said she needed a light for her cigarette and was planning to offer someone "a couple dollars" to give her ride to court. According to Kesha, a man in a burgundy "F150" stopped. Kesha "asked him for a light" and if she could give him the money to take her to the courthouse. When Kesha got into the truck, the man pointed a gun at her and told her he would "either blow [her] brains

off or kill [her]" if Kesha was not quiet. Kesha testified the man took her to a secluded area and forced her to have oral and vaginal intercourse several times. After the man had finished, Kesha stated she got out of the truck and sought help.

¶ 16     After voir dire, the trial court stated: "the [S]tate has indicated its intent to tender this evidence for the purpose of showing a plan, identity and/or modus operandi[.]" The trial court found "as a matter of law that the evidence is relevant." The trial court further found:

> The similarities between the cases the Court finds are as follows. Both the alleged victims were African-American females. They were both in Fayetteville . . . In both cases, there was the occurrence of vaginal and oral -- forced vaginal and oral sex. Both victims were on foot at the time of the assault. Both victims were moved to secluded areas for facilitation of the assaults. There was a threat to kill both victims and the alleged assailant, as to both cases, was a stranger to the victim in each case.

The trial court concluded, as a matter of law, the evidence was not admissible under Rule 404(b) to show common plan, scheme, or modus operandi. However, the trial court found that "identity is an issue." The trial court found that Defendant stated to investigators in Tamara's case that he "was not in Fayetteville in 2011." The trial court further found, as to identity, there was "a substantial similarity in the two cases . . . as both victims in each case identified the assailant as a black male, bald headed with a mustache." The trial court concluded it would allow the evidence of Kesha's alleged rape for the purpose of proving the identity of the assailant in Tamara's case

and give the jury a limiting instruction on that evidence. Defense counsel objected to the trial court's rulings.

¶ 17       The State called Kesha to testify before the jury. Kesha testified that, on the morning of 29 July 2009, she was supposed to be a witness in court. Kesha said she needed a ride to the courthouse because she had missed the bus she was going to take to the courthouse. Kesha stated as she was walking to the courthouse shortly after 8 a.m., "[a]n individual in a red truck stopped me and I asked for a light to my cigarette. Then I asked him could I get a ride to downtown to get to court because I didn't want to be late." Kesha said the man in the red truck offered to light her cigarette and that she offered the man "a few dollars" in gas money if he would give her a ride to court.

¶ 18       The man driving the truck agreed to take Kesha to court. Kesha described the man as "a Black male. He has a bald head and wears a mustache." Kesha testified, as she got in the truck and tried to put on her seatbelt, the man "pulled [a gun] on [her]." Kesha said the man told her if she did not cooperate, the man would "blow my head off or kill me[.]" According to Kesha, the man took her down a secluded dirt road into a wooded area. Kesha stated the man: "pulled out his penis. He stuck it in my vagina, took it out my vagina, put it in my mouth, put it back in my vagina and put it back in my mouth and ejaculated." Kesha said she did not consent to the sexual acts and that the man had not promised anything to Kesha in exchange for the sexual acts. Kesha testified she remembered: the truck was a "red or burgundy" F-150; there

were blankets and a bottle of baby oil in the truck; and there was a woman's identification tag hanging on the rearview mirror and Kesha recounted the name on the tag. Then Kesha got out of the truck and used a stranger's phone to call the police. The Record indicates defense counsel did not object to Kesha's testimony when it was introduced at trial.

¶ 19        After the close of the State's case-in-chief, Defendant did not offer any evidence in his defense. The trial court included in its jury instructions that the evidence of Kesha's rape could only be considered for the purpose of proving Defendant's identity in Tamara's rape, if the jury believed the evidence. The jury found Defendant guilty of the Second-Degree Rape and Second-Degree Sexual Offense charges but acquitted Defendant on the First-Degree Kidnapping charge. The State elected not to proceed on the Habitual Felon Indictment.

¶ 20        During sentencing, the trial court asked the State: "What's your position in regards to whether or not [Defendant's prior Attempted First-Degree Rape conviction] makes him a recidivist for the purpose of sentencing in this case?" The State responded: "Yes, Your Honor. So I looked up the statute and the statute, specifically as it relates to that offense, just lists out -- it doesn't specify the dates of offense." The trial court sentenced Defendant to an active term of 146 to 185 months in prison on the Second-Degree Rape charge and found that "second-degree rape is a reportable offense as that term is defined in 14-208.6." The trial court also sentenced

Defendant to an active term of 148 to 185 months on the Second-Degree Sexual

Offense charge, to run consecutively with the Second-Degree Rape sentence. The

trial court then stated:

> In regards to AOC CR 615, show the Defendant has been
> convicted of a sexually violent offense. That's under 1(B), that the
> Defendant has not been classified as a sexually violent predator.
> The Defendant is a recidivist, paragraph three. The offense is an
> aggravated offense, paragraph four. The offense did not involve
> the physical, mental, or sexual abuse of a minor. The Defendant
> will be required to register as a sex offender for the rest of his
> natural life, the Court determines as a condition of the statute.

The trial court continued: "In regards to satellite-based monitoring, that

requires a separate hearing, Madam D.A." The State responded: "Yes, Your Honor."

When the trial court asked if the State wanted to "deal with that now[,]" the State

declined stating, "they can deal with it at a separate hearing." Defendant gave oral

Notice of Appeal in open court. The same day, the trial court entered written

Judgments on the Second-Degree Rape and Second-Degree Sexual Offense

convictions. The trial court also entered two separate Judicial Findings and Order

for Sex Offenders—one for each conviction—requiring Defendant to register as a sex

offender and to enroll in satellite-based monitoring, after Defendant's release from

prison, for the remainder of his life (Sex Offender Registration Orders).

## **Issues**

¶ 22          The relevant issues on appeal are whether: (I) the trial court committed plain error by allowing evidence of Defendant's prior bad acts to prove his identity as the perpetrator in the alleged offenses in this case; and (II) whether the trial court (A) erred in concluding the jury had convicted Defendant of a sexually violent offense— and, thus, a reportable conviction, pursuant to N.C. Gen. Stat. § 14-208.6(5)—and, if not, (B) whether the trial court erred by not holding a hearing regarding satellite-based monitoring pursuant to N.C. Gen. Stat. § 14-208.40A(a).

## Analysis

### I. Prior Bad Acts

¶ 23          Defendant contends the trial court erred in admitting evidence of the prior alleged rape of Kesha for the purpose of proving his identity in this case pursuant to N.C. R. Evid. 404(b).  However, despite objecting following the voir dire of the witness, Defendant did not renew his objection to this evidence when the State actually sought to introduce it.  Defendant thus concedes our review is limited to whether the trial court's admission of the evidence constituted plain error.  *State v. Ray*, 364 N.C. 272, 277-78, 697 S.E.2d 319, 322 (2010).  "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result."  *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993) (citation omitted).

¶ 24    "We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b)." *State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012). North Carolina Rule of Evidence 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that [the person] acted in conformity therewith." N.C. Gen. Stat. § 8C-1, Rule 404(b) (2019). However, such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake . . . ." *Id.* "[B]efore evidence of other distinct crimes may be admitted under the [identity] exception, two requirements must be met. First, the identity of the defendant must be an issue in the case." *State v. Thomas*, 310 N.C. 369, 373, 312 S.E.2d 458, 460-61 (1984). "The second prong of the exception . . . requires that the circumstances of the two crimes be such as to tend to show that the crime charged and another offense were committed by the same person." *Id.* (citation and quotation marks omitted).

¶ 25    "In a criminal case, the identity of the perpetrator of the crime charged is always a material fact." *State v. Jeter*, 326 N.C. 457, 458, 389 S.E.2d 805, 806 (1990) (citation omitted). However, "identity is not always in issue." *State v. White*, 101 N.C. App. 593, 600, 401 S.E.2d 106, 110 (1991) (citing *State v. Johnson*, 317 N.C. 417, 425, 347 S.E.2d 7, 12 (1986)). Evidence of prior bad acts is admissible to prove identity "where the accused is not definitely identified." *State v. Williams*, 82 N.C.

App. 281, 284, 346 S.E.2d 315, 316 (1986) (citation omitted). "[U]nless the defendant presents alibi evidence, evidence of other crimes to show identity, either directly or indirectly (common plan), should not be admitted[.]" *Id.* (quoting *State v. Streath*, 73 N.C. App. 546, 550, 327 S.E.2d 240, 242, *disc. rev. denied*, 313 N.C. 513, 329 S.E.2d 402 (1985)).

¶ 26        In this case, while Defendant's identity was a material fact, it was not necessarily in issue. Defendant presented no evidence in his own defense, and did not claim an alibi at trial. The only evidence possibly giving rise to an alibi defense was a recording of an interview introduced by the State in which Defendant initially claimed he was out-of-state for the entire year of 2011. Here, however, evidence of the rape of Kesha occurring in 2009 is, at best, tangential to proving Defendant was, in fact, in North Carolina approximately two years later at the time of the rape in this case. Moreover, the circumstances of the two rapes, separated in time by approximately two years, while both horrific, are not so particularly similar as to necessarily constitute proof that the same individual committed both using a similar modus operandi. *See State v. Corum*, 176 N.C. App. 150, 156-57, 625 S.E.2d 889, 893 (2006) ("[T]here must be shown some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes." (citation and quotation marks omitted)).

¶ 27     Presuming, without deciding, however, that the admission of this 404(b) evidence constituted error, the second prong of our plain error analysis requires us to determine if, absent this error, the jury probably would have reached a different result. *Jordan*, 333 N.C. at 440, 426 S.E.2d at 697. In light of the overwhelming evidence of Defendant's identity and guilt presented in this case, Defendant has not shown the jury would have reached a different result.

¶ 28     The State presented DNA evidence showing 660 sextillion-to-one that Defendant's, and not someone else's, DNA was in Tamara's sexual assault kit. Defendant does not challenge this evidence on appeal. Further, Tamara affirmatively identified Defendant as her assailant and gave detailed testimony of the incident with Defendant. Tamara testified Defendant choked her and threatened to kill her if she did not acquiesce to his demand for intercourse. On cross examination, Tamara did not waver when asked if Defendant might have offered her something in exchange for sex—insinuating the encounter was consensual. In fact, she repeatedly stated she only followed Defendant because he said he knew where to find drugs. In light of this evidence, the jury would probably not have reached a different verdict absent the evidence of the prior rape. *See State v. Walker*, 316 N.C. 33, 40, 340 S.E.2d 80, 84 (1986) ("[T]he overwhelming evidence against the defendant prevented the error complained of from rising to the level of 'plain error[.]' "). Consequently, the trial court did not commit plain error by admitting evidence of the prior alleged rape.

## II. Reportable Offenses and Satellite-Based Monitoring

¶ 29    Defendant also argues the trial court erred by finding his convictions under former N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 were "sexually violent offenses" pursuant to N.C. Gen. Stat. § 14-208.6(5).  As such, according to Defendant, his convictions were not reportable convictions under N.C. Gen. Stat. § 14-208.6(4), and the trial court could not order Defendant to register as a sex offender.  Moreover, Defendant argues the trial court did not conduct a separate hearing regarding satellite-based monitoring and, thus, could not order Defendant to enroll in satellite-based monitoring.

¶ 30    As a threshold matter, Defendant did not file written notice of appeal from the trial court's Orders.  Rule 3 of our Rules of Appellate Procedure governs notices of appeal from the Sex Offender Registration Orders.  *State v. Brooks*, 204 N.C. App. 193, 194-95, 693 S.E.2d 204, 206 (2010).  Rule 3 requires parties to file written notice of appeal thirty days after the entry of such a judgment or order.  N.C.R. App. P. 3(a), (c) (2021).  Therefore, giving oral notice of appeal in open court is "insufficient to confer jurisdiction on this Court."  *Brooks*, 204 N.C. App. at 194-95, 693 S.E.2d at 206.  Recognizing his trial counsel only gave oral Notice of Appeal from the criminal Judgments and did not file written notice of appeal from the Sex Offender Registration Orders, Defendant has filed a Petition for Writ of Certiorari with this Court to grant review of the Sex Offender Registration Orders.

Rule 21 of our Rules of Appellate Procedure provides: "[t]he writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action[.]"  N.C.R. App. P. 21(a)(1) (2021); *see also* N.C. Gen. Stat. § 7A-32(c) (2019).  In our discretion, we allow Defendant's Petition and review the merits of his arguments.  *See State v. Green*, 229 N.C. App. 121, 128, 746 S.E.2d 457, 464 (2013) (granting certiorari where "[d]efendant conceded that although he properly gave oral notice of appeal in open court, he failed to file written notice of appeal" from the trial court's sex offender order).

## A.  Reportable Convictions

Here, the trial court found Defendant had been convicted of sexually violent offenses and, thus, reportable convictions.  The trial court also found Defendant was a recidivist and that the offenses were aggravated offenses.  Accordingly, the trial court ordered Defendant to register as a sex offender for life.  A trial court's statutory interpretation in sex offender registration cases is a question of law we review de novo.  *State v. Davison*, 201 N.C. App. 354, 357, 689 S.E.2d 510, 513 (2009) (citations omitted).  "In matters of statutory interpretation . . . '[w]hen the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required.' "  *Id*. (quoting *State v. Abshire,* 363 N.C. 322, 329-30, 677 S.E.2d 444, 450 (2009)).

¶ 33        "A person who is a State resident and who has a reportable conviction shall be required to maintain registration with the sheriff of the county where the person resides." N.C. Gen. Stat. § 14-208.7(a) (2019). A "reportable conviction" is any final conviction: "for an offense against a minor"; for "a sexually violent offense,"; "in another state of an offense, which if committed in this State, is substantially similar to an offense against a minor or a sexually violent offense as defined by this section"; or "in a federal jurisdiction (including court martial) of an offense, which is substantially similar to an offense against a minor or a sexually violent offense as defined by this section." N.C. Gen. Stat. § 14-208.6(4)(a)-(c) (2019).

¶ 34        The trial court found Defendant's convictions for former N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 were sexually violent offenses. In 2015, the General Assembly repealed and recodified both N.C. Gen. Stat. §§ 14-27.3 (second-degree rape) and 14-27.5 (second-degree sexual offense). An Act to Reorganize, Rename, and Renumber Various Sexual Offenses . . . , S.L. 2015-181, 2015 N.C. Sess. Laws 460 (the Act). The General Assembly also changed the definition of "sexually violent offense." N.C. Gen. Stat. § 14-208.6(5) now defines a sexually violent offense as:

> A violation of former G.S. 14-27.6 (attempted rape or sexual offense), G.S. 14-27.21 (first-degree forcible rape), G.S. 14-27.22 (second-degree forcible rape), G.S. 14-27.23 (statutory rape of a child by an adult), G.S. 14-27.24 (first-degree statutory rape), G.S. 14-27.25(a) (statutory rape of a person who is 15 years of age or younger and where the defendant is at least six years older), G.S. 14-27.26 (first-degree forcible sexual offense), G.S. 14-27.27

(second-degree forcible sexual offense), G.S. 14-27.28 (statutory sexual offense with a child by an adult), G.S. 14-27.29 (first-degree statutory sexual offense), G.S. 14-27.30(a) (statutory sexual offense with a person who is 15 years of age or younger and where the defendant is at least six years older), G.S. 14-27.31 (sexual activity by a substitute parent or custodian), G.S. 14-27.32 (sexual activity with a student), G.S. 14-27.33 (sexual battery), G.S. 14-43.11 (human trafficking) if (i) the offense is committed against a minor who is less than 18 years of age or (ii) the offense is committed against any person with the intent that they be held in sexual servitude, G.S. 14-43.13 (subjecting or maintaining a person for sexual servitude), G.S. 14-178 (incest between near relatives), G.S. 14-190.6 (employing or permitting minor to assist in offenses against public morality and decency), G.S. 14-190.9(a1) (felonious indecent exposure), G.S. 14-190.16 (first degree sexual exploitation of a minor), G.S. 14-190.17 (second degree sexual exploitation of a minor), G.S. 14-190.17A (third degree sexual exploitation of a minor), G.S. 14-202.1 (taking indecent liberties with children), G.S. 14-202.3 (Solicitation of child by computer or certain other electronic devices to commit an unlawful sex act), G.S. 14-202.4(a) (taking indecent liberties with a student), G.S. 14-205.2(c) or (d) (patronizing a prostitute who is a minor or has a mental disability), G.S. 14-205.3(b) (promoting prostitution of a minor or a person who has a mental disability), G.S. 14-318.4(a1) (parent or caretaker commit or permit act of prostitution with or by a juvenile), or G.S. 14-318.4(a2) (commission or allowing of sexual act upon a juvenile by parent or guardian). The term also includes the following: a solicitation or conspiracy to commit any of these offenses; aiding and abetting any of these offenses.

N.C. Gen. Stat. § 14-208.6(5) (2019).

¶ 35    Defendant is correct that former N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 are no longer expressly listed as sexually violent offenses under the current version of N.C. Gen. Stat. § 14-208.6(5). For its part, the State fails to provide any compelling

argument to the contrary, instead relying on statutory interpretations of N.C. Gen. Stat. § 14-208.6(5) and related arguments that would result only in a misreading and misapplication of the express statutory language—if not just ignoring it altogether.[3]

¶ 36        Our own analysis, however, reveals the Act that recodified N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 and amended N.C. Gen. Stat. § 14-208.6(5) also included an "effective date" clause stating:

> This act becomes effective December 1, 2015, and applies to offenses committed on or after that date. Prosecutions for offenses committed before the effective date of this act are not abated or affected by this act, *and the statutes that would be applicable but for this act* remain applicable to those prosecutions.

S.L. 2015-181, § 48, 2015 N.C. Sess. Laws 460, 472 (emphasis added).

¶ 37        Defendant was prosecuted and convicted under the former statutes for acts he committed in 2011, prior to the effective date of the amended N.C. Gen. Stat. § 14-208.6(5). According to the Act's plain language, the prior version of N.C. Gen. Stat. §

---

[3] For instance, the State argues statutory language, permitting a trial court to decide whether an offense committed under the law of another sovereign—i.e. another state or the federal government—is substantially similar so as to qualify as a reportable offense, permits our courts to ignore the exclusive list of North Carolina statutes provided by the General Assembly and simply judicially engraft into the statute other offenses under North Carolina law the General Assembly could have listed, but did not. The State also argues "common sense" allows us to ignore the statutory language and decree Defendant's convictions should be reportable offenses. Finally, the State also speculates had Defendant been charged and tried of crimes that are listed in the current statute, a jury would have convicted Defendant of those offenses, too; and, thus, we should conclude the offenses for which Defendant was, in fact, convicted, should be considered reportable offenses. Each of these arguments is untenable.

14-208.6(5)—in which N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 were listed—which would have applied, *but for* the 2015 amendment, still applies to prosecutions and convictions under those former offenses. Therefore, in this case, Defendant's convictions under N.C. Gen. Stat. §§ 14-27.3 and 14-27.5 were sexually violent offenses and were reportable convictions for the purpose of requiring Defendant to register as a sex offender. [4] *See State v. Dye*, 254 N.C. App. 161, 170 n. 3, 802 S.E.2d 737, 743 n. 3 (2017) ("Sexually violent offense is, in turn, defined as including, *inter alia,* 'a violation of . . . G.S. 14-27.25(a).' N.C. Gen. Stat. § 14-208.6(5). N.C.G.S. § 14-27.7A, of which Defendant was convicted, was later recodified at N.C. Gen. Stat. § 14-27.25(a) in 2015. *See* 2015 N.C. Sess. Laws ch. 181 § 7(a). Therefore, Defendant's conviction qualified as a reportable conviction."). Consequently, the trial court did not err in ordering Defendant to register as a sex offender.

### B. Satellite-Based Monitoring

¶ 38　　　Finally, Defendant argues the trial court could not impose satellite-based monitoring without holding a hearing on the issue. Whether a trial court has properly adhered to the procedures for imposing satellite-based monitoring under N.C. Gen.

---

[4] For reference purposes, the University of North Carolina School of Government has published a flow-chart which assists in identifying crimes which may constitute reportable convictions. Jamie Markham, *Revised Sex Offender Flow Chart (July 2017 Edition)*, https://nccriminallaw.sog.unc.edu/revised-sex-offender-flow-chart-july-2017-edition/ (last visited May 3, 2021).

Stat. § 14-208.40A is a question of law we review de novo. *Davison*, 201 N.C. App. at

357-61, 689 S.E.2d at 513-15.

¶ 39          N.C. Gen. Stat. § 14-208.40A provides:

> (a) When an offender is convicted of a reportable conviction as defined by G.S. 14-208.6(4), during the sentencing phase, the district attorney *shall* present to the court any evidence that (i) the offender has been classified as a sexually violent predator pursuant to G.S. 14-208.20, (ii) the offender is a recidivist, (iii) the conviction offense was an aggravated offense, (iv) the conviction offense was a violation of G.S. 14-27.23 or G.S. 14-27.28, or (v) the offense involved the physical, mental, or sexual abuse of a minor. The district attorney shall have no discretion to withhold any evidence required to be submitted to the court pursuant to this subsection.
>
> The offender *shall* be allowed to present to the court any evidence that the district attorney's evidence is not correct.
>
> (b) *After receipt of the evidence* from the parties, the court shall determine whether the offender's conviction places the offender in one of the categories described in G.S. 14-208.40(a), and if so, shall make a finding of fact of that determination, specifying whether (i) the offender has been classified as a sexually violent predator pursuant to G.S. 14-208.20, (ii) the offender is a recidivist, (iii) the conviction offense was an aggravated offense, (iv) the conviction offense was a violation of G.S. 14-27.23 or G.S. 14-27.28, or (v) the offense involved the physical, mental, or sexual abuse of a minor.
>
> (c) If the court finds that the offender has been classified as a sexually violent predator, is a recidivist, has committed an aggravated offense, or was convicted of G.S. 14-27.23 or G.S. 14-27.28, the court shall order the offender to enroll in a satellite-based monitoring program for life.

N.C. Gen. Stat. § 14-208.40A(a)-(c) (2019) (emphasis added).

¶ 40        Thus, the statute requires the trial court, when considering imposing satellite-based monitoring during the sentencing phase, to conduct a hearing where: the State shall present evidence to the trial court regarding the defendant's eligibility; the defendant *shall* be permitted to rebut that evidence; and, after the trial court receives the evidence, the trial court *shall* determine if the defendant is eligible for monitoring and, if so, shall order the defendant to enroll in such monitoring.

¶ 41        Here, the trial court found—after only eliciting evidence of recidivism from the State and for sentencing purposes:

> In regards to AOC CR 615, show the Defendant has been convicted of a sexually violent offense. That's under 1(B), that the Defendant has not been classified as a sexually violent predator. The Defendant is a recidivist, paragraph three. The offense is an aggravated offense, paragraph four. The offense did not involve the physical, mental, or sexual abuse of a minor. The Defendant will be required to register as a sex offender for the rest of his natural life, the Court determines as a condition of the statute.

However, the trial court acknowledged satellite-based monitoring required "a separate hearing." The State elected to not proceed with that hearing during the sentencing phase stating: "they can deal with [satellite-based monitoring] at a separate hearing."[5] As such, the State presented no evidence as to Defendant's

---

[5] Such a hearing would be governed by N.C. Gen. Stat. § 14-208.40B. *See* N.C. Gen. Stat. § 14-208.40B(a)-(c) (2019) ("When an offender is convicted of a reportable conviction as defined by G.S. 14-208.6(4), and there has been no determination by a court on whether the offender shall be required to enroll in satellite-based monitoring, the Division of Adult

eligibility regarding monitoring, and Defendant was not afforded the opportunity to present evidence contradicting the State's evidence. Thus, the trial court did not conduct a hearing on the issue, pursuant to N.C. Gen. Stat. § 14-208.40A, and erred by ordering Defendant to enroll in satellite-based monitoring prior to holding the required hearing on the issue. *See State v. Sheridan*, 263 N.C. App. 697, 708, 824 S.E.2d 146, 154 (2019) ("In this case, no evidence was presented prior to or to support the trial court's determination that Defendant would be subject to SBM for the remainder of his life. We vacate the order requiring Defendant to enroll in SBM for the remainder of his life, and remand for proper analysis and determination under N.C. Gen. Stat. § 14-208.40A."). Consequently, we vacate the trial court's Sex Offender Registration Orders and remand the issue of satellite-based monitoring for proper analysis pursuant to N.C. Gen. Stat. § 14-208.40A.

## **Conclusion**

Accordingly, for the foregoing reasons, (I) there was no plain error in Defendant's trial and we affirm the Judgments entered upon the jury verdicts; and (II) (A) the trial court properly concluded Defendant's convictions in this case were sexually violent offenses and, thus, reportable offenses; however, (B) the trial court erred in ordering Defendant enroll in satellite-based monitoring without holding a

---

Correction . . . shall make an initial determination" and the trial court of the county where the offender lives shall conduct a hearing as to the offender's eligibility.).

hearing on the issue, and we vacate the Sex Offender Registration Orders and remand this matter to the trial court for further proceedings on satellite-based monitoring.

NO PLAIN ERROR AT TRIAL; AFFIRMED IN PART; VACATED IN PART AND REMANDED.

Judges DILLON and GRIFFIN concur.